761 So.2d 388 (2000)
BROWARD COUNTY SCHOOL BOARD, Appellant/Cross-Appellee,
v.
Luis John CRUZ, by and through his parent, Jane Alice CRUZ, and Jane Alice Cruz, individually, Appellees/Cross-Appellants.
No. 4D98-2170.
District Court of Appeal of Florida, Fourth District.
May 3, 2000.
Rehearing Denied June 27, 2000.
*389 Amy D. Ronner, Miami, and Bruce J. Winick, Coral Gables, Pro Hac Vice, for appellant/cross-appellee.
Gale Ciceric Payne of Gale Payne & Associates, Fort Lauderdale, for appellees/cross-appellants.
EN BANC
SHAHOOD, J.
A jury found appellant, the Broward County School Board ("School Board"), negligent and awarded $2,697,725.00 to appellee, Luis John Cruz ("Cruz"), a special education student who was injured by another student on school property, and $3,500,000 to Cruz's mother, appellee, Jane Alice Cruz ("Mrs.Cruz"). The trial court granted the School Board's motion for remittitur, and reduced the award to Mrs. Cruz to $1,000,000. All other post-trial motions filed by the School Board, including a motion for new trial and a motion for judgment notwithstanding the verdict, were denied, and the School Board appealed.
With the exception of one issue, which we agree constitutes reversible error, we affirm the remaining issues and various sub-issues raised by the School Board in this appeal. This opinion addresses only the trial court's failure to allow the School Board to conduct an independent neurological examination of Cruz, the trial court's ruling allowing Cruz's non-medical expert to give a medical opinion on the cause of Cruz's organic brain damage, and the issue raised by Cruz on cross appeal of whether a parent's right to recovery for loss of filial consortium extends beyond the child's age of minority.
Based on one issue raised by the School Board, we reverse and remand for a new trial. We certify to the supreme court the issue raised on cross appeal as one of great public interest.

I. General Factual Background
During the 1993 school year, when the incident giving rise to this lawsuit occurred, Cruz was a 15-year-old who was attending Miramar High School in the exceptional education cluster "ESE." Cruz *390 was mentally handicapped with significant brain damage as a result of having been born three months premature. He functioned at a second- or third-grade level, although, by all accounts, he was physically active and enjoyed playing sports or fishing or visiting museums after school and on the weekends. There was testimony that he was a calm and obedient child, but that he did get frustrated easily and had trouble staying on task. He was not prone to having fits of rage, never used foul language, and never exhibited psychotic behavior.
On November 30, 1993, while on the way to a class, Cruz encountered another student, Donny Velasquez ("Velasquez"), outside in the area between the portable classrooms. Velasquez was a tenth grader at the high school, but he had a learning disability which required him to attend exceptional education classes part of the day. He was also a wrestler and football player. The two boys had some sort of altercation or confrontation which resulted in Velasquez's pushing or dropping Cruz to the ground and Cruz landing on his head. There were different accounts of the incident. For example, one student testified that she witnessed Velasquez taunt Cruz by calling him names and then saw him pick Cruz up and "slam" him straight down so that he "went all the way down to hit his head first on the ... concrete." Another student testified that he saw the two boys shaking hands and Cruz began "karate chopping" Velasquez. When Cruz would not stop hitting, Velasquez grabbed him in a "bear hug," picked him up off of the ground, and let him go. Cruz's account of the incident was that as he went to shake Velasquez's hand, Velasquez threw Cruz to the ground.
Velasquez's account of the incident changed several times. On the date of the incident, he gave a signed statement that he had approached Cruz and, playing around, the two began to shake hands when Cruz started taking swings at Velasquez. Velasquez said that, in response to Cruz's provocation, he picked Cruz up, threw him on the ground, and went to class. Six months later, however, Velasquez gave another statement to the effect that he put Cruz in a bear hug and then let him go; as he let go, Cruz fell to the ground. Finally, on the day of trial, Velasquez testified that Cruz put out his hand to shake Velasquez's hand and gripped Velasquez's hand putting pressure, so Velasquez squeezed back. When Velasquez shook Cruz's hand, Cruz "karate chopped" Velasquez, so he picked Cruz up, "threw him on the floor so he won't hit me no more, and walked away." Velasquez saw Cruz's "butt hit the ground first," and heard Cruz say "help, help." Velasquez turned around, but Cruz was sitting up, so Velasquez figured he was okay and walked away.
Four of the ESE teachers testified. Three of them did not see what happened between Cruz and Velasquez. The fourth said she heard a "gang type yelling outside" her classroom. She stuck her head out and saw "a person in a blue jacket lift up Louie Cruz and slam him down in a head-first type manner." What she saw was not a bear hug. She heard a "loud hollow type thud" which she "thought was [Cruz]'s head" hitting the cement. A second teacher, who had been standing in the doorway of her classroom speaking with a student, heard crying from outside and opened the door to find Cruz on the ground with two other teachers going to his aid.
Cruz sustained a bump on his head, but a CAT scan and EEG performed soon after the incident all looked normal. A later EEG showed abnormalities. Approximately two months after the incident, however, his behavior began to change drastically. He began "whistling and howling and doing really weird things" like standing on one leg and "making these huge sounds that just vibrated the bedroom." He stopped talking and his eyes appeared "vacant." Shortly thereafter, Cruz began taking antipsychotic medications, *391 and remained on them as of the date of trial. The doctors had to experiment with various medications at different dosages because Cruz had adverse effects such as tremors, psychotic behavior, and incidences of violent behavior. As of the date of trial, Cruz was on the fourth or fifth different antipsychotic medication, at the brink of taking the maximum dosage, and his psychotic behavior and fits of rage were still not being controlled. One year after the incident, Cruz was allowed to return to school.
Cruz's psychiatrist, Dr. Weiner, treated him for approximately two years and ultimately diagnosed Cruz with post traumatic stress disorder. Dr. Weiner referred Cruz to a second doctor, a neurologist, who agreed with that diagnosis. A different psychiatrist, Dr. Klass, saw Cruz in September 1995, and, while he agreed that Cruz suffered from "an adjustment disorder due to a traumatic event," he opined that Cruz's condition could have been exacerbated by social trauma, i.e., domestic violence in his home, but without having seen reports of such, Dr. Klass was unable to say that that was the cause of exacerbation in Cruz's case.
There was testimony from one psychologist that Cruz's post-accident IQ and motor functioning were unchanged. That same psychologist opined that Cruz was capable of doing the same jobs after the accident as he was before it. Another witness, a rehabilitation counselor, disagreed and opined that Cruz was no longer employable.

II. Denial of School Board's Request for Independent Neurological Examination
Approximately five months prior to the commencement of trial, the School Board scheduled an independent medical examination ("I.M.E.") of Cruz to be conducted by Dr. Brown, a pediatric neurologist. Cruz canceled the appointment claiming surprise, and the School Board filed a motion seeking an order compelling attendance. Cruz opposed the motion stating:
Plaintiff has not put his neurological condition at issue insofar as Plaintiff has not retained a neurologist. Thus, as Plaintiff is currently intending to present no testimony from a neurologist, there is no need for Defendants to subject Plaintiff, LUIS JOHN CRUZ, to such an examination.
At the hearing on the motion, Cruz's counsel told the court that Cruz's neurological state was not an issue. He argued that a neurologist would be "overbroad," and that the experts were "evenly matched" since the School Board's psychiatrist examined Cruz for eight hours. Based on that representation, the court denied the request for an I.M.E.
After the hearing, Cruz's counsel sent a letter to the School Board's counsel stating the following:
This letter is to clarify our position relating to presentation of testimony relating to Luis John's neurological condition at trial. Our psychiatric expert, Dr. Walter Afield, is, by definition, a medical doctor, and has neurological training. Thus, he may testify in this capacity. We would assume your psychiatrist, being a medical doctor, would also be familiar with the neurological components of psychiatric and closed head injuries.
However, Dr. Stuart Brown, is a pediatric neurologist. We have not retained a pediatric neurologist, nor a general neurologist. As pointed out at hearing yesterday, Luis John is no longer technically even age-eligible for pediatric care per se. Thus, it is not apparent that Dr. Brown would have been qualified in either case.
In other words, our psychiatrist is anticipated to testify to the neurological component of his head injury due to his training and his status as a medical doctor. We would assume Dr. Mutter, is similarly situated and qualified, and would anticipate him to render similar testimony on your behalf.
*392 Approximately one month later, the School Board, having received the report of Dr. Afield, Cruz's neuropsychologist, filed a motion for sanctions and other remedies. The report was dated January 2, 1997, but the School Board had not received it until May 28, 1997 at a mediation attempt. The report showed that Dr. Afield had done neurological testing on Cruz in January. At the hearing on its motion, the School Board also presented the deposition of Dr. Appel, Cruz's other neuropsychologist, who testified as follows:
[Question]: So, if I were to state to you that Luis John Cruz did not suffer a neurological injury as a result of this incident, that would be ...
[Answer]: I'd think I'd say you're out of your mind. I would wonder where you are coming from. And that's not a pejorative statement. Please understand this.
The School Board also presented the court with Cruz's March 1997 answers to interrogatories in which Cruz's counsel represented that a summary of the grounds for each opinion of each expert was "unknown at present." The School Board sought only that the court continue the trial and give them an opportunity to have a neurological examination done on Cruz.
Cruz's counsel responded that none of the examinations that Dr. Brown wished to conduct related to the organic brain damage. Ms. Weaver, counsel for Cruz, also told the court that her co-counsel, Mr. Clark, who had represented at the last hearing that there were no neurological damages, had been mistaken and that is why she had him write the letter clarifying their position. Ms. Weaver stated that, despite any misunderstanding, the School Board knew from the beginning that Cruz was claiming organic brain damage and, further, the School Board's counsel never requested additional information even after they received the clarifying letter. Ms. Weaver also explained that although she had hoped that Dr. Appel would conduct the neurological examination on Cruz, it had already been done by Dr. Afield. Therefore, because the tests could not be re-done within a certain time period for medical reasons, Dr. Appel would have to reach her opinion by reviewing the raw data obtained by all of the experts, including Dr. Russel and Dr. Levitt, the School Board's experts; counsel for Cruz saw no reason why the School Board's experts could not do the same. The court refused to delay the trial for eleven months, the time at which it would be medically safe to retest Cruz, and denied the School Board's motion.
At trial, as promised, Cruz's experts opined that he had organic brain damage and neurological injuries as a result of the accident. Both experts opined that the brain damage was permanent and likely to worsen as Cruz got older, eventually requiring institutionalization.

III. Dr. Appel's opinion on causation
Without objection from the School Board, Dr. Appel was qualified as an expert in the fields of forensic medicine, neuropsychology, and scientific research into the brain and brain damage. Dr. Appel is not a medical doctor and was limited by the court on several occasions from going into too much detail about certain medical procedures. During her testimony, in response to the School Board's objection, the attorneys debated at a side-bar conference over whether certain testimony was medical testimony or merely an explanation of chemistry. The School Board argued that Dr. Appel had been designated as an expert in neuropsychology, a field which did not qualify her to discuss brain injury or mechanism of injury but rather, limited her to explaining tests for cognitive impairment and evaluating cognitive ability. Dr. Appel explained that neuropsychology involves neurochemistry and neuroanatomy and is the study of how the brain functions and what happens when it is injured. The court instructed Dr. Appel: "[A]s long, Doctor, as you don't give a medical opinion, as long as you say through the chemical process, this is what *393 happened, but you can't give a medical opinion, okay." He told her that she must give her opinion from a neuropsychological and not a medical "springboard."
Despite this admonition, Cruz's counsel asked the following of Dr. Appel:
Do you have an opinion, Doctor, as to whether this change in his functional behavior is evidence of structural or organic changes occurring when his head was slammed to the ground?
The court overruled an objection that this was beyond the witness' expertise, and Dr. Appel gave the following answer:
There is nothing in the record other than the event in which his head was slammed to the ground that can account for the change that was seen. The slamming to the ground, all of the things I've been talking about over the last two days, the forces that are applied, the movement of the brain, they clearly have impacted the disinhibition. They have clearly impacted the way this young man's brain is functioning and are responsible for the changes in behavior that you have just listed.

IV. Analysis
We begin the discussion with the issue of whether the School Board should have been allowed to conduct an independent neurological examination of Cruz. We recognize that the granting of a continuance is subject to an abuse of discretion standard of review, see Woods v. State, 490 So.2d 24 (Fla.), cert. denied, 479 U.S. 954, 107 S.Ct. 446, 93 L.Ed.2d 394 (1986), and find that, in this case, that discretion was abused.
According to Florida Rule of Civil Procedure 1.360, subject to a showing of good cause, "a party may request any other party to submit to ... examination by a qualified expert when the condition that is the subject of the requested examination is in controversy." Fla. R. Civ. P. 1.360(a)(1). When a plaintiff in a negligence action asserts that he has sustained a mental or physical injury, he places his condition in controversy, and good cause for the examination is therefore shown. See Dominique v. Yellow Freight Sys., Inc., 642 So.2d 594 (Fla. 4th DCA 1994), rev. denied, 651 So.2d 1193 (Fla.1995); see also Anderson v. Anderson, 470 So.2d 52, 53 (Fla. 4th DCA 1985)(there must be an affirmative showing by the movant that each condition for which examination is sought really and genuinely is in controversy and that good cause exists for ordering same). It is not enough that the defendants are allowed to depose plaintiff's medical experts and then review plaintiff's medical records. Dominique, 642 So.2d at 596.
Despite any argument to the contrary, Cruz's mental condition was clearly in controversy in this case. The trial court was misled by arguments that Cruz had not retained his own neurologist, that he did not intend to present testimony from a neurologist, and that the experts were "evenly matched." In fact, Cruz's lead counsel recognized the predicament her co-counsel had placed them in at the hearing, and attempted to clarify Cruz's position in the post-hearing letter to the School Board wherein it was stated that Cruz did indeed intend to present "testimony relating to [his] neurological condition at trial"; however, that testimony would be presented by a psychiatric expert, "Dr. Walter Afield, [who] is, by definition, a medical doctor, and has neurological training." Counsel was incorrect in assuming, however, that because Cruz's psychiatric expert would "testify to the neurological component of [Cruz]'s head injury due to his training and his status as a medical doctor," the School Board's psychiatric expert should be expected to do the same.
Because the cause of Cruz's mental condition and, specifically, the change, if any, in his neurological state, was the central issue in this trial, the School Board should have been allowed the opportunity to have its own expert conduct an independent examination. We have not over-looked *394 the fact that, because Cruz had already undergone a neurological examination, a second one could not safely be performed on him prior to the date set for trial and without a continuance for a significant period of time. We nevertheless hold that, under the circumstances, it was an abuse of discretion not to grant the continuance. Further, we reject the argument that the error was harmless solely because neither party's neuropsychologist was able to conduct his own examination and both were called upon to testify by reviewing the data compiled by a third doctor. See Dominique.
Next, we address whether it was error for the trial court to allow Dr. Appel to give a medical opinion on the cause of Cruz's organic brain damage, even though she is not a medical doctor. Generally, a witness may be qualified as an expert based upon "knowledge, skill, experience, training, or education...." § 90.702, Fla. Stat. Qualification of a witness as an expert, as well as the range of subjects about which the witness will be allowed to testify, are within the trial judge's broad discretion. Holiday Inns, Inc. v. Shelburne, 576 So.2d 322, 335 (Fla. 4th DCA 1991); see also Seaboard Air Line R. Co. v. Lake Region Packing Ass'n, 211 So.2d 25, 31 (Fla. 4th DCA 1968)("[I]t is generally recognized that one may qualify to express an opinion as a skilled or expert witness by virtue of study of authoritative sources even without practical experience."). An appellate court will not interfere with the trial judge's discretion absent a showing that it is clearly erroneous and prejudicial to the adverse party. See Holiday Inns, Inc.
In considering whether a neuropsychologist is qualified to render an opinion about the cause of organic brain damage, we must reexamine Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA), rev. denied sub. nom., Commercial Union Ins. Co. v. DeSerio, 480 So.2d 1293 (Fla.1985). In DeSerio, this court held that although a clinical psychologist who was not a medical doctor could testify to the existence of organic brain damage, he could not testify that the accident caused the organic brain damage. Id. at 1029. The court held that since psychologists are not medical doctors, they cannot render opinions as to the physical cause of brain damage, as that is considered in Florida to be a medical subject. DeSerio, 468 So.2d at 1029. The error in DeSerio was ultimately held to be harmless, however, because it was determined that medical testimony was not necessary to establish causation where the logical sequence of events established that prior to the accident, DeSerio did not manifest the symptoms, and after the accident she did. Id.
The field of psychology has evolved significantly since the DeSerio decision, and that decision now represents the minority view. See, e.g., Huntoon v. T.C.I. Cablevision of Colorado, Inc., 969 P.2d 681 (Colo.1998)(en banc)(disagreeing with DeSerio, and holding that neuropsychologists are not per se unqualified to speak on the causation of organic brain injury); Hutchison v. American Family Mut. Ins. Co., 514 N.W.2d 882 (Iowa 1994)(refusing to impose limitations on expert testimony other than those imposed by the rules of evidence). In fact, Chapter 490, Florida Statutes (1997), the Psychological Services Act, was amended after DeSerio, to include in its definition of the "practice of psychology" the diagnosis and treatment of "the psychological aspects of physical illness, accident, injury, or disability, including neuropsychological evaluation, diagnosis, prognosis, etiology, and treatment." § 490.003(4), Fla. Stat. (1997)(emphasis added). Thus, because the practice of psychology has expanded to the point where psychologists who are not doctors are increasingly becoming involved in areas which were traditionally considered to be purely medical, a blanket prohibition of testimony by psychologists concerning causation of brain injury no longer seems practical.
*395 Instead, the more prudent approach is to allow trial judges, in their discretion, to qualify psychologists and neuropsychologists to testify on causation as any other expert would be qualified to testify in his or her area of expertise. A psychologist's or neuropsychologist's competency to give an opinion will be subject only to the limitations imposed by 90.702, Florida Statutes. We, therefore, recede from DeSerio to the extent that it precludes a psychologist or neuropsychologist, whose education, training and experience are found by the trial court to be sufficient, from rendering an opinion on the cause of a mental disorder or condition.
In this case, the record showed that Dr. Appel is a neuropsychologist whose study of the brain goes back as far as 1964 when she obtained her undergraduate degree. Subsequently, she was involved in considerable research and experimentation concerning the effects of various visual stimuli on the brain, the effects of gravity on the brain, and the effects of other forces on the brain. She continued in her study of neuropsychology, focusing primarily on fetal brain and spinal cord surgery. She taught neuro-ophthalmology, and served as a consultant in a major hospital to the departments of neurosurgery, neurology and endocrinology. She explained that her work frequently requires her to consult and work side by side with neurosurgeons, neuropathologists, neuroophthalmologists, and neuroradiologists.
The trial court's conclusion that Dr. Appel was qualified to give an opinion as to the cause of Cruz's organic brain damage is amply supported in the record. Therefore, it was not an abuse of discretion to allow her to so testify.
On cross appeal, Cruz takes issue with the court's reduction of the filial consortium award from $3,500,000 to $1,000,000 based on a finding that the award should cover only the four-year period between the date of the incident and the date of trial. At the time of the incident, Cruz was fifteen years old; at the time of trial, he was nineteen years old.
Since the factual issue of whether Cruz was severely and permanently injured will be re-considered by the jury on remand, we need not discuss it here. In order to guide the trial court in instructing the jury on re-trial, however, it is necessary to discuss the issue of whether an award to a parent for loss of filial consortium as a result of severe injury to a child is limited to, or extends beyond, the child's minority.
In United States v. Dempsey, 635 So.2d 961 (Fla.1994), the supreme court recognized a parent's right to recover for the permanent loss of filial consortium due to a significant injury which results in the child's permanent total disability. See id. at 965. The court defined loss of consortium to include not only the traditional loss of the child's services and earnings, as at common law, but also the loss of companionship, society, love, affection, and solace of the injured child. See id. In expanding the common law beyond only pecuniary damages, the supreme court noted:
This is a logical conclusion in light of the fact that when our common law rules are in doubt, this Court considers the "`changes in our social and economic customs and present day conceptions of right and justice.'" Hoffman v. Jones, 280 So.2d 431, 435 (Fla.1973)(quoting Ripley[v. Ewell, 61 So.2d 420, 423 (Fla. 1952)]). Certainly, in 1973, when this Court set forth the elements of damages that a parent of an injured child is entitled to recover, it was apparent that a child's companionship and society were of far more value to the parent than were the services rendered by the child. Thus, there was an obvious need to recognize this element of damages to fully compensate the parent for the loss suffered because of a negligent injury to the child. The recognition of the loss of companionship element of damages *396 clearly reflects our modern concept of family relationships.
See Id. at 964.
In Dempsey, the supreme court did not expressly speak to the issue of whether damages for loss of filial consortium should be limited to the child's minority, or whether they should extend into the child's majority. Although the supreme court in that case clearly expanded the common law to provide parents of severely injured children with an additional element of recovery, we do not, however, read Dempsey as a license to abandon all of the common law in this area. Specifically, at common law, damages for the loss of a child's services and earnings were recoverable only to the end of the child's minority. See generally Wilkie v. Roberts, 91 Fla. 1064, 109 So. 225, 227 (1926)(At common law, a parent's recovery for his pecuniary loss as a result of injury to his child "was limited to two elements: (1) The loss of the child's services and earnings, present and prospective, to the end of the minority; and (2) medical expenses in effecting or attempting to effect a cure."). We do not interpret Dempsey as having either expressly or impliedly broadened the recovery to a time beyond the child's majority.[1] We, therefore, are compelled to follow common law unless and until our supreme court states otherwise. See Hoffman, 280 So.2d at 435.
Thus, on remand, should the jury find that Cruz suffered a severe, permanent injury, the filial consortium award to Cruz's mother should be calculated only from the date of the incident to the date Cruz attained majority. We also certify to the Supreme Court the following question as one of great public importance:

WHETHER THE AWARD FOR LOSS OF FILIAL CONSORTIUM TO A PARENT EXTENDS BEYOND THE CHILD'S AGE OF MAJORITY WHEN IT HAS BEEN DETERMINED THAT THE CHILD HAS SUSTAINED A PERMANENT TOTAL DISABILITY?
Accordingly, we reverse and remand for a new trial.
REVERSED AND REMANDED.
WARNER, C.J., DELL, GUNTHER, STONE, POLEN, KLEIN, GROSS, TAYLOR and HAZOURI, JJ., concur.
STEVENSON, J., concurs specially with opinion, in which
FARMER, J., concurs.
STEVENSON, J., concurring specially.
I join in the en banc decision and write separately only to express my view that this court should recede from Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA), review denied sub nom., Commercial Union Ins. Co. v. DeSerio, 480 So.2d 1293 (Fla.1985), not because the "field of psychology has evolved significantly since the DeSerio decision," but because DeSerio's categorical rule prohibiting an appropriately trained and educated psychologist from offering expert testimony concerning the physical cause of brain damage was wrong at the time it was decided.
FARMER, J., concurs.
NOTES
[1] In Dempsey, the supreme court cited Howard Frank, M.D., P.C. v. Superior Court of Arizona, 150 Ariz. 228, 231, 722 P.2d 955, 958 (1986)(en banc). Although Frank was cited for a different proposition, we note that in that case, the Arizona Supreme Court rejected the age distinction and extended the filial consortium action to adult children. The court stated:

In particular, we can find no reason for limiting the class of plaintiffs to parents of minor children when the parents of adult children may suffer equal or greater harm. Why should the parents of an injured seventeen-year-old be allowed to recover for loss of consortium, but not the parents of an injured eighteen-year-old?
150 Ariz. at 234, 722 P.2d at 961.