KAHN, Judge.
Appellant James L. Bishop challenges a worker’s compensation order denying permanent total disability benefits and supplemental benefits. He asserts that the judge of *508 compensation claims (JCC) erred by not admitting the testimony of his primary treating physician or his treating psychologist and by finding that he did not sustain his burden of proof to support a finding of permanent and total disability. We affirm.
Mr. Bishop is 47 years old and a high school graduate. Prior to the compensable accident on September 14, 1988, he had a long history of back problems. During a two-month period in 1987, Bishop made approximately 18 emergency room visits complaining of back problems, and received prescriptions for narcotics on several occasions. While in the course and scope of his employment on September 14,1988, Mr. Bishop was the victim of an assault in his hotel room. The assailant threw Bishop from a second floor balcony, causing head, wrist and back injuries. As a result of the back injuries, Mr. Bishop came under the care of Dr. Edmund C. Dyas, III, an Alabama orthopedist. Dr. Dyas performed two surgical procedures on Mr. Bishop’s back. Mr. Bishop received psychological care and treatment from Daniel L. Koch. According to Koch, Bishop had post-eoncussive symptoms, post-traumatic stress disorder, and major depression related to chronic pain. Koch related Bishop’s complaints to the industrial accident.
According to Dr. Dyas, the treating orthopedist, Bishop represented that he spent a good portion of the day in bed, and that his condition remained the same through the end of 1995. Surveillance conducted in January 1996, however, revealed Bishop lifting a bale of hay, carrying the bale at least 40 yards, lifting the bale overhead and over a fence, bending and stooping to remove twine off a bale of hay, and spreading hay. A private investigator who testified at the final hearing observed Bishop walking up and down stairs, getting in and out of cars, crawling under a car, and generally appearing physically normal. Still photographs introduced into evidence show Bishop bending over, walking with a bale of hay, and stepping over a small fence. A lay witness, Mr. Irvine, observed Bishop building a fence in March 1995. Specifically, Irvine saw Bishop digging a hole for a fencepost and dragging a large post to place in the hole. Irvine did not notice that Bishop had any problems performing the work. Irvine also recalled seeing Bishop assist a neighbor in pulling the neighbor’s tractor out of a ditch. According to Irvine, Bishop drove a tractor to the place where the neighbor’s tractor was stuck and helped get the stuck tractor pulled out and up onto a trailer. In a deposition taken in July 1990, Bishop testified he had not had any problems with his back for approximately 15 years. Mr. Bishop changed this testimony at the final hearing after learning that the employer/carrier’s attorney had placed into evidence the emergency room records substantiating the 1987 hospital visits mentioned above. Mr. Bishop, unaware of the surveillance, or the observations of the private investigator and Mr. Irvine, testified at a deposition on January 24, 1996, that he would be unable to put in fenceposts or do any yard work. Bishop testified at that deposition that he does very little or nothing during the day.
The JCC considered, but rejected, the conclusions of Dr. Dyas. The JCC offered a detailed explanation of his analysis of Dr. Dyas’ testimony:
4. ... In his initial deposition of July 14, 1994 Dr. Dyas states he had no history from the claimant of any preexisting back complaints. However, his subsequent deposition of February 13, 1996 reflects that approximately a year and a half (ljé) earlier, between February and April 1987, the claimant made approximately eighteen (18) emergency room visits complaining of back problems and was given narcotics to control the pain. Apparently the claimant has long history of back problem pre-dating this industrial accident.
Notwithstanding, Dr. Dyas found the claimant suffered osteoarthritic changes of post-traumatic arthritis and after treating him conservatively for approximately one (1) year, recommended lumbar fusion. The first surgery was performed some time in late August or early September of 1992. Because the claimant was an incessant smoker, he did not heal well and apparently the fusion did not take thereby resulting in a second surgery on or about August of 1993. The claimant has not returned to work since his first surgery. *509 Dr. Dyas’ medical note of May 8, 1995 reflects that he found the claimant had reached maximum medical improvement with a “40% disability of the body as a whole from the anatomic standpoint as rating in Alabama.” He went on further to state that “as far as any ability to work he is totally and permanently disabled from the functional standpoint.” After having carefully reviewed Dr. Dyas’ medical report and two (2) medical depositions, I find that his opinions as to the claimant’s “disability” and a purported impairment rating of 40% must be rejected as contrary to law and acceptable medical procedure.
In Photo Electronics Corp. v. Glide, 398 So.2d 900 (Fla. 1st DCA 1981) the court held that a treating physician’s opinion about a claimant’s disability constituted testimony “beyond his competency as a medical expert.” Permanent physical impairment is a medical issue. This is to be distinguished from “disability” which is a legal question. “Disability” is defined in section 440.02(9), Florida Statutes (1988) as the incapacity because of injury to earn wages the claimant was receiving at the time of injury. “Permanent impairment” is related directly to the health and physical condition of the claimant. Disability is determined within the context of personal, social, and occupational demands as a result of an impairment and is therefore not a medical determination. Therefore employer/earrier’s objection to Dr. Dyas’ opinion as to disability is sustained and stricken.
Dr. Dyas qualified his opinion that the claimant is permanently and totally disabled by stating that this was from a “functional standpoint.” Even if one assumes that Dr. Dyas’ opinion as to functional “disability” is really an opinion of functional “impairment,” that bases for that opinion is primarily what the claimant and his wife told him as to what the claimant can and cannot physically do. The surveillance belies the claimant’s testimony as to his restricted and limited physical activities and I would therefore reject Dr. Dyas’s testimony since it is based on a false picture painted by the claimant.
Therefore, I find that even though Dr. Dyas was capable and qualified to testify as to the claimant’s limitations, he chose not to and rather chose to opine on disability, a matter beyond his expertise. There is simply no evidence of any physical limitations or restrictions.
5. In addition, I also reject and sustain the employer/earrier’s objection as to, Dr. Dyas’ impairment rating of 40%. Again, Dr. Dyas seems to be expressing an opinion on “disability” even though he couches it from a “anatomical standpoint.”
Section 440.15(l)(b), Florida Statutes, in pertinent parts provides that permanent total disability shall be determined in accordance with the facts. One could argue that a specific impairment rating is irrelevant so long as the claimant has some physical restrictions which prevent that claimant from uninterruptedly doing even light duty work. Notwithstanding, I must reject Dr. Dyas’ opinion of a 40% rating of the body as a whole for the following reasons: first, it does not comport with logic and reason. Second, it is based on Alabama Statutes or Guides which simply provide for a 40% disability anatomic rating based on a two-level back fusion regardless of physical limitations. Third, the rating factors in the claimant’s age, education and past industrial history, as testified to by Dr. Dyas, are all considerations for a disability or vocational determination. The aforesaid statutory section also requires that “the determination of the existence and degree of permanent impairment must be based upon medically or scientifically demonstrable findings and cannot be based on the claimant’s complaint or [JCC’s] evaluation of those complaints and mere observation of the claimant.” Frank’s Fine Meats v. Sherman, 443 So.2d 1055, 1056 (Fla. 1st DCA 1984). Finally, since this is a Florida Workers’ Compensation matter any permanent physical impairment rating must be based on the American Medical Association Guides which are applicable from this date of accident. Torres v. Smithkline Beecham Co., 659 So.2d 327 (Fla. 1st DCA 1995).
*510 The JCC also considered and rejected much of the testimony of psychologist Koch, offering the following analysis:
7. ' The claimant has also treated with Dr. Daniel Koch, Ph.D., a psychologist referred to by Dr. Dyas. The initial visit was on April 25, 1994 approximately five and a half (5]é) years post accident. Dr. Koch’s initial tests reflect that the claimant is of normal intelligence and tends to exaggerate his symptoms for secondary gain, that his response to pain is more than normal and that his physical complaints usually appear after stressful periods without a traceable organic basis. Dr. Koch’s diagnosis was that the claimant suffered from a post-concussion syndrome, post-traumatic stress disorder (PTSD) and major depression secondary to PTSD. Dr. Koch stated that the PTSD is now largely resolved as is his depression and that the claimant currently suffers from chronic pain with mild post-eoncussive symptoms. Dr. Koch found the claimant at maximum medical improvement in May of 1995 with a 30% impairment. This rating too is not within the appropriate AMA Guides or any acceptable guides known to the undersigned. He testified that this was based primarily on a computer analysis which reflected a mild neuropsychological impairment and the use of guides from a psychologist named “Richard Rogers.” The analysis performed in February, 1995 found the claimant, scored 27 wherein his initial score which reflected a neurological impairment was 31. Dr. Koch stated that if the claimant scored 25 or lower, he is no longer psychologically impaired and therefore no impairment rating would be warranted. He found the claimant has improved over the year since his last testing in February, 1995. Therefore the 30% impairment appears inconsistent and should be rejected when one considers his improvement and minimal psychological impairment at this time and the use of inappropriate guides.
Dr. Koch seems to indicate that the claimant might have suffered organic brain injury and therefore the basis for his mild neuropsychological impairment. After reviewing his deposition of January 29, 1996, one gleans his attempt to offer an opinion as to the causal relationship of the claimant’s industrial accident to a head injury or concussion. Such an opinion must be rejected. Dr. Koch had no record reflecting any testing for such condition. Further, Dr. Dyas’ depositions indicate that he was not even aware of a head injury. Dr. Koch stated he had little history of such an injury other that the fact that the claimant lost consciousness.
Further, Dr. Koch’s opinion as to a causal relation between any organic brain injury and his industrial accident must be rejected. First, he did not examine the patient until five and a half (5/é) years post-accident. Second, there is no medical evidence of any head injury. Even though psychologists are competent to testify as to the existence of organic brain damage, Executive Car & Truck Leasing v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA 1985), a psychologist cannot testify that an accident resulted in physical injury causing organic brain. Haas v. Seekell, 538 So.2d 1333 (Fla. 1st DCA 1989). Since psychologist are not medical doctors, they cannot render an opinion as to physical cause of brain damage, considered in Florida to be a medical subject. DeSerio, 468 So.2d at 1029. Employer/carrier’s objection as to this opinion must also be sustained as being beyond Dr. Koch’s expertise.
Therefore, I find little evidence that the claimant has a psychological impairment at this time that would prevent either a job search or gainful employment.
The JCC took into account lay testimony as to claimant’s purported restrictions and limitations. Such testimony was weighed against the surveillance films and testimony detailing claimant’s actual physical activities during the time in question. Bottoming his conclusions largely upon claimant’s credibility, the JCC found, “the claimant is certainly capable of doing more than what he claims he can physically do ... [H]is restrictions and limitations are primarily self-imposed without medical basis and for purposes of secondary gain.” The JCC also noted a complete absence of vocational evidence to suggest that claimant is unemployable or totally *511 disabled due to physical limitations. Finally, the JCC noted that claimant had not performed a lengthy or exhaustive job search, nor presented evidence to excuse a job search. Because the JCC found that claimant had not proven permanent total disability by medical testimony of physical restrictions combined with vocational evidence, or by proof of a lengthy, but unavailing, job search he denied the claim. See e.g., Boles v. West Orange Paint & Body, 667 So.2d 951 (Fla. 1st DCA1996).
The JCC’s order in this case is supported by competent substantial evidence and makes no error of law. It is based upon the specific facts of this case, upon the inadequate medical testimony presented by appellant, and by appellant’s own lack of credibility in reporting his symptoms and restrictions. Reversal of such an order would constitute an unwarranted excursion into the domain of the finder of fact.
The dissent asserts that the Judge of Compensation Claims committed an error of law because he refused to credit the employer’s attorney’s suggestion that the AMA Guides would rate claimant’s impairment at 12 percent. The attorney’s attempt to suggest what the impairment rating would be under the AMA guides does not, however, constitute competent substantial evidence as a matter of law. Obviously, the attorney’s questions are not evidence in this case, and moreover, Dr. Dyas never agreed with the attorney’s suggestion as to an appropriate impairment rating. The exchange between the employer’s lawyer and Dr. Dyas went as follows:
Q. (By counsel for the Employer/Carrier) In Florida we’ve got, uh, unlike probably, Alabama, we use the, uh, some guides that are specific on impairment ratings. And I want to show you the guide that was effective at the time, AMA Guide Third Edition. Using this guide, it would appear to me that, un, his impairment rating ... you get 12 percent.
A. (By Dr. Dyas) You see the name of this book? Says “Guides to the Evaluation.” The way I was taught to do evaluations for disabilities at Duke University ... I use that as a guide_ This is a guide. Two-level back fusion. Good, bad, indifferent, is 40 percent disability, anatomic rating in my book.
^ ^
A: I mean, a disability rating is like an oil painting. I mean, I did it. That’s mine. If y’all don’t like it, they’ve got plenty of guys that will paint you a picture.
Q: I know. I’m not arguing with you and I understand. But if there was somebody that used the AMA Guides and looked at the AMA Guides, he would have a 12 percent. But you say it’s 40.
A: Based on what I have already said and how I arrive at that, I’d say it’s 40.
Q: But if you look strictly to the book, which I know you don’t do, it would be a 12?
A: That’s a guide.
Q: That’s right.
A: It’s not a rating book.
Q: But if you look at the guide?
A: You could use that as a guide and then you’ve got to say what you know about the patient, includes in there to.
Q: So what you do in the patient is, the 12 percent the guide. But what you look at is his age, his education, his past industrial history.
A: I try to do all that, and that culminates in that.
Q: An that’s what you come up with, the 40?
A: It seems to be a little easier in Alabama.
Appellant contends that the JCC overlooked ease law holding that a physician’s failure to apply the AMA Guides renders the evaluation incompetent only as to the amount of impairment, and not to the fact that some impairment exists. This argument, however, is beside the point. The JCC in this ease in fact found a “serious injury ... traumatic enough to aggravate any preexisting back condition the claimant might have had thereby necessitating two surgical fusions.” Even were we to assume some degree of permanent impairment, however, the result here would not change because the claimant failed *512 to meet his burden of proof on other elements of the claim.
The case primarily relied upon by the dissent, Cabrera v. Universal Trusses, Inc., 429 So.2d 768 (Fla. 1st DCA 1983), is not instructive on the issue before the court. In Cabrera, the treating physician did in fact assign a permanent impairment rating. The physician’s mistake in that case was to rely upon the guidelines of the American Academy of Orthopedic Surgeons, rather than upon the AMA Guides. 429 So.2d at 769. Here, the doctors persisted in providing a disability rating rather than an anatomic impairment rating as required by the AMA Guides. See Photo Electronics Corp. v. Glide, 398 So.2d 900 (Fla. 1st DCA 1981)(doctor is qualified to testify only as to anatomic or functional impairment within his medical expertise; JCC alone must make determination of disability). Moreover, Cabrera was a wage loss case, in which the proof of some degree of permanent impairment would have presumably led to an entitlement to wage loss under the then-existing workers compensation law. The present case is a permanent total disability case in which the claimant bears the burden of demonstrating medical or vocational inability to perform even light work on an uninterrupted basis. § 440.15(1)(b), Fla. Stat. (1987). The remand suggested by the dissent would of necessity be for the purpose of allowing claimant to completely retry his case, and not merely for “further findings.” *
In summary, this case is not simply- about a JCC’s insistence that a doctor’s testimony as to permanent impairment comport with the AMA Guides. Instead, this ease involves a failure of proof on the part of the claimant, the party in this case with the burden of proof. Indeed, given the extremely thorough treatment of the issues by the JCC, we are unable to see what the difference would be in this ease, even were we to assume a 12 percent impairment rating.
AFFIRMED.
BENTON, J., concurs.
ERVIN, J., concurs and dissents with written opinion.

 In his brief appellant quite candidly asks for remand "to the JCC to allow Mr. Bishop an opportunity to present additional evidence concerning his permanent impairment and entitlement to compensation benefits.”