858 So.2d 999 (2003)
Mark S. GRENITZ, M.D., Petitioner,
v.
Jacob Thomas TOMLIAN, Respondent.
Humana of Florida, Inc., etc., Petitioner,
v.
Jacob Thomas Tomlian, Respondent.
Nos. SC01-1259, SC01-1260.
Supreme Court of Florida.
June 5, 2003.
Rehearing Denied October 21, 2003.
*1000 Debra Potter Klauber of Haliczer, Pettis & White, P.A., Ft. Lauderdale, FL, for Petitioners Mark S. Grenitz, M.D., et al.
Sylvia H. Walbolt, E. Kelly Bittick, Jr. and Joseph H. Lang, Jr. of Carlton Fields, P.A., St. Petersburg, FL, for Petitioner Humana of Florida, Inc., etc.
Todd R. Schwartz of Ginsberg & Schwartz, Miami, Florida; and Sheldon J. Schlesinger and Robert W. Kelley of Sheldon J. Schlesinger, P.A., Ft. Lauderdale, FL, for Respondents.
LEWIS, J.
We have for review Tomlian v. Grenitz, 782 So.2d 905 (Fla. 4th DCA 2001), which expressly and directly conflicts with the decisions in GIW Southern Valve Co. v. Smith, 471 So.2d 81 (Fla. 2d DCA 1985), and Bishop v. Baldwin Acoustical & Drywall, 696 So.2d 507 (Fla. 1st DCA 1997). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
The facts, as set forth in the district court's opinion, are as follows:
After what appeared to be a normal pregnancy, plaintiffs' son [Jacob Tomlian] was born with significant brain damage known as cerebral palsy, resulting from oxygen deprivation. Plaintiffs contended that the injury occurred during a difficult birth as a result of the negligence of the obstetrician and hospital, but defendants contended that it had occurred earlier, between twenty-six to thirty-four weeks of the mother's pregnancy which, according to defendants, is when this type of brain damage usually occurs.
Plaintiffs' expert neuropsychologist, who testified that the injury was caused by oxygen deprivation at birth, was not permitted to give his opinion as to why the injury had not occurred weeks prior to the birth, as contended by defendants. The trial court sustained defendant's objections to this testimony based on the state of the law as it existed at that time, which was that a psychologist, who is not a medical doctor, is not qualified to render an opinion as to the cause of brain damage. Executive Car & Truck *1001 Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA 1985).
Tomlian, 782 So.2d at 906. The district court reversed the jury verdict for defendants and remanded the case for a new trial, noting that in Broward County School Board v. Cruz, 761 So.2d 388 (Fla. 4th DCA), approved, other grounds, 800 So.2d 213 (Fla.2001), the Fourth District had receded from its prior holding in DeSerio, which it now considered to be contrary to the greater weight of authority. See Cruz, 761 So.2d at 394 (Fla. 4th DCA 2000) (holding that psychologists are not precluded from testifying as to the cause of brain injury, based in part upon the district court's acknowledgment that, after DeSerio, the Florida Legislature had broadly defined the practice of psychology in section 490.003(4), Florida Statutes (1997)). The district court also rejected the argument that the error was not preserved because of the two-issue rule, which provides that "where two issues are submitted to a jury, only one of which is infected with error, the appellate court will assume the jury found for the prevailing party on the issue which was error-free, unless it can be determined from the form of verdict that the error was prejudicial." Tomlian, 782 So.2d at 906 (citing Whitman v. Castlewood Int'l Corp., 383 So.2d 618 (Fla.1980)). In so doing, it reasoned that this Court had clarified that the two-issue rule applies only to actions predicated on two independent theories of liability: "In the present case there was only one theory of liability, negligence, and accordingly the two-issue rule is not applicable." Id. at 907 (citing First Interstate Dev. Corp. v. Ablanedo, 511 So.2d 536 (Fla. 1987)).

Neuropsychologist's Competence to Testify Regarding Nonpsychological Causation of Organic Brain Injury
In Tomlian, the Fourth District perpetuated its change in the Florida legal evidentiary standard affecting a neuropsychologist's competency to testify concerning the nonpsychological cause of organic brain injury. The district court deemed the departure warranted by a change in section 490.003(4), Florida Statutes:
Plaintiffs' expert neuropsychologist, who testified that the injury was caused by oxygen deprivation at birth, was not permitted to give his opinion as to why the injury had not occurred weeks prior to the birth, as contended by defendants. The trial court sustained defendant's objections to this testimony based on the state of the law as it existed at that time, which was that a psychologist, who is not a medical doctor, is not qualified to render an opinion as to the cause of brain damage. Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA 1985).
During the pendency of this appeal, this court receded from DeSerio and held that psychologists are not precluded from testifying as to the cause of brain injury. Broward County School Bd. v. ex rel. Cruz, 761 So.2d 388 (Fla. 4th DCA) rev. granted, No. SC00-1550, 779 So.2d 270 (Fla.2000) (recognizing that the Florida Legislature had, after DeSerio, broadly defined the practice of psychology in section 490.003(4), Florida Statutes (1997), and that the decision in DeSerio was contrary to the current weight of authority). We are, of course, bound to apply the law as it exists on appeal, Fla. Patient's Compensation Fund v. Von Stetina, 474 So.2d 783 (Fla. 1985), and therefore agree with plaintiffs that the neuropsychologist's testimony should have been admitted.
782 So.2d at 906.
This broad holding, through which the Fourth District receded from its *1002 prior holding in DeSerio, is contrary to the theretofore clearly announced existing rule in Florida. That rule is grounded on the fundamental observation that the determination of a nonpsychological or medical cause of organic brain damage is a medical judgment. As stated in GIW, a psychologist "may properly give opinion testimony as to an existing mental condition, see Ross v. State, 386 So.2d 1191 (Fla.1980); Reese v. Naylor, 222 So.2d 487 (Fla. 1st DCA 1969), and existing organic brain damage." 471 So.2d at 82. However, neither the wording of the statute itself[1] nor its legislative history[2] supports the proposition that a neuropsychologist is competent to testify regarding medical causes of organic brain damage. Indeed, the "practice of psychology" is defined in section 490.003(4) to include only the diagnosis and treatment of "the psychological aspects of physical illness, accident, injury, or disability, including neuropsychological evaluation, diagnosis, prognosis, etiology, and treatment." (Emphasis supplied.) "Under the principle of statutory construction, expressio unius est exclusio alterius, the mention of one thing implies the exclusion of another." Moonlit Waters Apartments Inc. v. Cauley, 666 So.2d 898, 900 (Fla.1996). The evaluation and assessment of nonpsychological or medical aspects of physical illness, accident, injury, or disability are thus, by implication, properly excluded from the statutory definition. This would necessarily include any nonpsychological medical causes of organic brain injury leading to psychological impairment.
Of course, under the law existing prior to this case, a neuropsychologist is competent to testify regarding the results of psychological testing reflecting the presence of organic impairment. See generally Bishop v. Baldwin Acoustical & Drywall, 696 So.2d 507, 510 (Fla. 1st DCA 1997) (observing that, although psychologists are competent to testify as to the existence of organic brain damage, they "cannot testify that an accident resulted in physical injury causing organic brain [damage]"); GIW, 471 So.2d at 82 (observing that a psychologist may give opinion testimony as to an existing mental condition and existing organic brain damage). Here, in fact, the record reflects that Dr. Crown, the plaintiffs' expert neuropsychologist, did testify *1003 regarding Jacob's standardized test results, and rendered an expert opinion that they reflected Jacob's organic brain damage. Thus, the neuropsychologist was permitted to testify with regard to the etiology (brain damage) of the behavior he evaluated. He should not have been permitted to testify as to the medical causation of the organic brain damage itself.[3]
Using this basis as a predicate, a qualified physician could then properly have coordinated such test results with other relevant information in formulating a medical opinion regarding the nonpsychological medical cause of the organic brain damage.[4] Here, the district court achieved the correct result but we believe such was based upon the wrong reasons. Contrary to the district court's decision, the trial court here did not err in disallowing the opinion testimony of someone other than a qualified physician as to the medical causation of Jacob's brain damage.[5] However, the trial court did err in limiting the presentation of opinion evidence of Dr. Crown.
When the proffered testimony of Dr. Crown is fully analyzed, it becomes clear that the true issue of substance to be resolved is not whether the neuropsychologist could testify as to medical causation but, on the contrary, whether such profession and the particular witness here was competent to testify with regard to brain and behavioral development and the relationship of behavioral and functional patterns to human brain development. This is a far different inquiry and analysis than that involved in the consideration of medical causation issues impacting brain development. This record is both most interesting and telling in this regard as we dissect that which occurred during trial.
First, as reflected in the trial proceedings and presented on appeal and review here by all parties, there has never been an issue as to whether the child, Jacob, has a significant brain injury. The existence of a brain injury is undisputed. In a similar manner, although this case may be somewhat unique, the medical cause of such brain injury was also not in dispute. The defendants' expert related the cause of the brain injury to oxygen deprivation. The medical cause of this brain injury was described by the plaintiffs' experts in *1004 terms of episodes of hypoxia, resulting in decreased oxygenation. Thus, it is understandable that the defense voiced no objection when inquiry was made to the neuropsychologist, Dr. Crown, as to whether, in his opinion, Jacob had organic brain damage and he responded in the affirmative. Additionally, it is also understandable that there was no defense objection to the inquiry of Dr. Crown concerning the etiology of the organic brain damage and his response that such was brought about by oxygen deprivation because this conclusion was not in dispute. The record reflects that in the interrogation of Dr. Crown:
Q. [by plaintiffs' counsel]: Do you have an opinion, sir, within a reasonable degree of neuropsychological probability, as to whether Jacob has organic brain damage?
A: [Dr. Crown]: Yes. It is my opinion that Jacob does have organic brain damage.
Q: What is organic brain damage?
A: Organic brain damage is damage to the cortex, damage to the brain. Its something that has impaired or created deficits and defects in the brain.
Q: Does Jacob have damage to an otherwise normal, healthy brain?
A: Yes.
. . . .
Q: Did you form opinions in this case as to the etiology of Jacob's condition?
A: Yes.
Q: Tell us, please.
A: It's my opinion that that damage that I see neuropsychologically was brought about by an oxygen deprivation experience at the intrapartum level or in the neonatal period.
Q: And intrapartum means what, sir?
A: At birth.
All of the foregoing was presented in the presence of the jury without objection of any type. Thus, the neuropsychologist presented, without objection, Jacob's condition (brain damage), along with the etiology of the condition (oxygen deprivation experienced at the intrapartum level).
It was a follow-up question:
Q: [By Plaintiffs' counsel]: How can you tell it didn't happen some months before?
That produced the defense objection which was sustained by the trial court and resulted in the limitations placed upon the testimony of the neuropsychologist. An attempt to elicit testimony with regard to "ruling out" etiologies was also precluded by a defense objection.
Based upon the foregoing, we are now faced with a somewhat hybrid circumstance in that testimony was presented by a neuropsychologist without objection that brain damage existed and its cause was oxygen deprivation. While the medical causation aspect of this expert testimony may have been objectionable, no objection was voiced because all parties apparently agreed with the ultimate medical causation. It was also proper under existing authority for the trial court, upon proper objection by the opposition, to preclude this expert witness in neuropsychology from specifically expressing opinions as to "ruling in" or "ruling out" medical causations. However, this does not respond to the issue as to whether a qualified neuropsychologist may express opinions with regard to stages of brain development and temporal relationships as they relate to behavioral and functional development. This is an issue separate from medical causation conclusions and one that is not truly answered by the authorities which prohibit psychologists from testifying as to the medical causation of brain damage. It must be understood that while medical causes of hypoxic events may have many *1005 and diverse origins, ranging from blood chemistry to metabolic deficiencies, which require expert medical analysis, the neuropsychologist was not entering such area here. The issue is whether the trial court erred in refusing to permit the neuropsychologist to testify with regard to temporal stages of organic brain development as reflected in and through behavioral and functional conditions and evaluations. There has been no assertion in this case that this type of expert cannot express opinions with regard to relating these behavioral and functional conditions to organic brain conditions.
We must begin our analysis with the nature of the first question, the objection voiced and consideration of the totality of the proffered testimony excluded. Although the defense asserts, and the dissenting opinion agrees, that the entire inquiry was objectionable because it sought to elicit medical causation opinions, we cannot agree with this structural analysis. While a psychologist may not be permitted to testify as to the medical causation of brain damage or the medical causation of an agreed-upon hypoxic event which produces brain damage, such is not the nature of the initial inquiry made here. As reflected in the reproduction of the proffered testimony provided in the dissenting opinion, the psychologist was asked multiple questions directed to the temporal stages of organic brain development as related to and reflected in behavioral and functional condition evaluations. See dissenting op. at 1011. This first line of questioning produced the psychologist's conclusion that Jacob's condition did not reflect a delay in total brain development, but rather an impairment that would have occurred late in the developmental process. This type of testimony was well within the psychologist's ambit of expertise based on the results of his clinical evaluation of Jacob as informed by existing research, data, and literature regarding the stages of brain development. This portion of the proffered testimony was clearly distinct and severable from that pertaining to the medical causation timing of the hypoxic event, which could have been properly excluded by the trial judge. The objection voiced and sustained was directed to a proper question which would have produced an admissible answer.
Our frame of reference here is not upon chapter 490 and the general description of psychology but, to the contrary, upon the educational, functional, and practical background and experience of the particular witness. This witness specialized in clinical and forensic neuropsychology devoted to the study, teaching, and treatment of brain function and behavior. The area of expertise included both educational and practical involvement with how the human brain works, how the brain functions, and how brain development and function relates to human behavior. Subsumed within this field of expertise is the category of study involving specific areas of brain damage and the corresponding effects on behavior. This expert had a bachelor's degree, a master's degree, and a Ph.D., accompanied by twenty-nine years of practical experience ranging from teaching in the university and medical school context to clinical application in the private patient arena. He reviewed the pertinent medical records and was involved in a clinical examination and evaluation of Jacob. Dr. Crown's education and background placed him in a position to relate observable and objective behavior and function to the organic source of such factors. The context of gait, motor skills, speech articulation, auditory processing, and other similar human behavioral and functional aspects can be related to organic sources. The evidence indicated that these behavioral and functional observations can also be related *1006 in a temporal manner to organic brain development or injury through examination and evaluation. Through the analysis of patterns of deficits or preserved islands of brain integrity along with an underlying knowledge of structural organic brain development, the witness was in a competent position to express opinions of temporal references with regard to brain development, injury, and the corresponding behavioral and functional deficits and areas of integrity without reference to the medical causation of such injury. This did not call for the improper expression of opinion concerning medical causation, which was the erroneous basis for the exclusion of such testimony. Thus, in our view, the district court below attained the correct result although through an unacceptable approach.

Application of the Two-Issue Rule
Turning now to application of the two-issue rule, we conclude that the Fourth District correctly determined that the rule did not apply in this case. We have previously defined the two-issue rule as follows:
[W]here there is no proper objection to the use of a general verdict, reversal is improper where no error is found as to one of two issues submitted to the jury on the basis that the appellant is unable to establish that he has been prejudiced.

Whitman v. Castlewood Int'l Corp., 383 So.2d 618, 619 (Fla.1980) (citing Colonial Stores, Inc. v. Scarbrough, 355 So.2d 1181 (Fla.1977)).
Here, the petitioners argue that the rule applies because the defense was predicated on two distinct grounds: (1) the absence of negligence and (2) the absence of a causal connection between any alleged negligence and Jacob Tomlian's condition. They assert that, since the verdict form used did not provide for separate answers regarding these two issues, the respondents cannot demonstrate that the exclusion of a portion of Dr. Crown's causation testimony was prejudicial; therefore, the jury's verdict cannot be reversed. The Fourth District rejected this argument:
After Gonzalez [v. Leon, 511 So.2d 606 (Fla. 3d DCA 1987)] and Barhoush [v. Louis, 452 So.2d 1075 (Fla. 4th DCA 1984)], the Florida Supreme Court clarified that the two-issue rule applies only to actions brought on two theories of liability. First Interstate Dev. Corp. v. Ablanedo, 511 So.2d 536 (Fla.1987). More recently, in Barth v. Khubani, 748 So.2d 260 (Fla.1999), the Florida Supreme Court reiterated that the two-issue rule "does not apply where there is only one cause of action." Id. at 262 n. 7, citing with approval this court's decision in LoBue, in which this court refused to apply the two-issue rule to a case involving one theory of recovery, negligence. In the present case there was only one theory of liability, negligence, and accordingly the two-issue rule is not applicable.
Tomlian, 782 So.2d at 907 (footnotes omitted).
We agree with the Fourth District that the two-issue rule does not apply where, as here, the two "defenses" involved comprised separate elements of proof (breach of duty and proximate cause) necessary for the plaintiffs to prevail on a single cause of action (negligence). As reasoned by the district court in LoBue v. Travelers Insurance Co., 388 So.2d 1349 (Fla. 4th DCA 1980):
[T]he appellees assert that appellant has failed to demonstrate reversible error because the jury may have rejected her claim of negligence and never considered the issue of permanent injury or damages as required by the no fault statute. We do not believe this calls for the application of the two-issue rule enunciated in Colonial Stores, Inc. v. *1007 Scarbrough, 355 So.2d 1181 (Fla. 1978[1977]). The appellant's claim was not predicated on multiple theories of responsibility and we do not believe the rule should be extended to require a claimant to specifically demonstrate the precise element of the cause of action the jury found lacking. To do so would require the use of an interrogatory type verdict in all cases detailing the elements of the claim and the defenses thereto. We do not believe this was contemplated by the Supreme Court in Scarbrough, supra.
Id. at 1352 n. 3. This Court specifically approved that conclusion in Barth v. Khubani:
Although we disapprove of the conflict cases to the extent they employ a misdirected focus in their application of the "two issue rule," we do not disapprove of them to the extent they hold or explain that the rule does not apply where there is only one cause of action or one separate and distinct defense theory. See, e.g., LoBue, 388 So.2d at 1351-52 n. 3 (stating that "we do not believe the rule should be extended to require a claimant to specifically demonstrate the precise element of the cause of action the jury found lacking").
748 So.2d at 262 n. 7. Thus, the Fourth District's reasoning on this issue is sound.

CONCLUSION
Based upon the foregoing, we approve the result attained by the Fourth District below, but we disapprove its reasoning to the extent of inconsistency with this opinion. We also approve the decisions in GIW and Drywall to the extent they are consistent herewith. We remand this case to the district court with instructions that the final judgment be reversed and the action remanded to the trial court for a new trial.
It is so ordered.
QUINCE, J., concurs.
PARIENTE, J., concurs in result only with an opinion, in which ANSTEAD, C.J., concurs.
WELLS, J., concurs in part and dissents in part with an opinion, in which CANTERO, J., and SHAW, Senior Justice, concur.
PARIENTE, J., concurring in result only.
To the extent that the majority adopts a bright-line rule that a properly trained and qualified neuropsychologist can never testify to the cause of brain damage, I disagree.[6] I would leave this question to the *1008 sound discretion of the trial court based on the criteria for admission of expert testimony set forth in section 90.702, Florida Statutes (2002).[7] Frankly, in many cases the causation issue, whether framed as "legal" cause, "physical" cause, or "medical" cause, is whether the accident in question caused the brain damage, and that is an area specifically within a properly trained and qualified neuropsychologist's expertise. In this case, the issue as to when Jacob's brain damage occurredeither in utero or at birthwas the determinative causation question.[8]
The majority acknowledges that a neuropsychologist can testify to the existence of brain damage, which is a physiological condition. See majority op. at 1003. The majority also acknowledges that a properly trained and qualified neuropsychologist can testify to the stages of brain development. See majority op. at 1005-06. Thus, I see no reason to conclude that a neuropsychologist is per se unqualified to give an opinion as to the cause of brain damage regardless of his or her background and training.
In receding from its 1985 decision in Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA 1985), holding that a neuropsychologist was permitted to testify to the existence of brain damage but not the cause of brain damage, the Fourth District explained in a unanimous en banc opinion:
[T]he more prudent approach is to allow trial judges, in their discretion, to qualify psychologists and neuropsychologists to testify on causation as any other expert would be qualified to testify in his or her area of expertise. A psychologist's or neuropsychologist's competency to give an opinion will be subject only to the limitations imposed by 90.702, Florida Statutes.
Broward County Sch. Bd. v. Cruz, 761 So.2d 388, 395 (Fla. 4th DCA 2000), approved, 800 So.2d 213 (Fla.2001). I agree with Cruz and would adopt this approach. As noted by Cruz, the majority of courts in this country have rejected the bright-line rule used in DeSerio. See, e.g., Huntoon v. T.C.I. Cablevision of Colorado, Inc., 969 P.2d 681, 689 (Colo.1998) (en banc) (holding that neuropsychologists are not per se unqualified to speak on the causation of organic brain injury); Hutchison v. Am. Family Mut. Ins. Co., 514 N.W.2d 882, 887-88 (Iowa 1994) (refusing to impose limitations on expert testimony other than those imposed by the rules of evidence).
As explained by the Colorado Supreme Court in Huntoon, the "majority of states ... have resisted the creation of artificial barriers to the admission of expert testimony by drawing lines between the various professions." Huntoon, 969 P.2d at 690. The majority of jurisdictions addressing the issue have found that "neuropsychologists may, with proper *1009 foundation, opine on the physical cause of organic brain injury," and "choose to analyze the propriety of such testimony under the standard rules governing expert witnesses." Id. Even the Pennsylvania decision cited by the Fourth District in DeSerio to support its conclusion that the neuropsychologist in that case could not testify that the accident in question caused the brain damage does not support a rigid rule that never allows a neuropsychologist to testify on the issue of causation. See Simmons v. Mullen, 231 Pa.Super. 199, 331 A.2d 892, 899 (1974) (acknowledging that "[p]erhaps a psychologist is able to ascertain causation" but concluding that the trial court erred in allowing the psychologist to testify as to causation because the expert's testing exposed only the mere existence of defects).
The field of neuropsychology has evolved significantly in the past decades. See Cruz, 761 So.2d at 394-95. Further, neuropsychologists are an integral part of the study, diagnosis, and treatment of brain damage, often working side-by-side with the medical profession. Indeed, a neurologist, whose specialty does not involve surgery, attempts to diagnose the existence of brain damage based on a battery of procedures that may include a physical examination and gross neurological assessments such as reflex testing, coordination testing, and gaze testing. The neurological examination may also test the patient's orientation to time and place. At times the neurologist is able to determine the existence or even the cause of brain damage from medical tests such as EEG's and CAT scans of the brain. But many times, these tests are not diagnostic and the neurologist may seek the expertise of the neuropsychologist. As noted by an Illinois appellate court, "it would be somewhat anomalous to conclude that [the neuropsychologist] would not be qualified to testify about [the cause of the plaintiff's injury] when the neurologists ... who sought out his expertise and assistance in diagnosing the disease would most likely be qualified to do so." Valiulis v. Scheffels, 191 Ill.App.3d 775, 138 Ill.Dec. 668, 547 N.E.2d 1289, 1296-97 (1989).
In fact, diagnosing the existence of brain damage depends many times on the results of a battery of standard neuropsychological tests, a highly accurate and specialized method of determining the existence, location, and cause of brain damage. Moreover, while in some cases the nature of the opinion may require expertise only supplied by one trained in medicine, in many other cases, the determinative causation issue, which is whether the acute trauma of the accident caused the brain damage, is a proper subject to which a qualified and trained neuropsychologist should be permitted to testify.[9]
*1010 This neuropsychological testing can often ascertain whether the brain damage is focal or diffuse, which may be the basis for determining whether an acute trauma caused the brain damage. The neuropsychologist can also utilize other historical testing and information that might be available, including IQ tests or school records to buttress any opinion as to the causal relationship of the brain damage to the accident in question.
The practice of neuropsychology, as distinct from psychology, is a highly specialized area that involves training in the fields of psychology and medicine. In this case, Barry Crown holds a Ph.D. and is the Head of Neuropsychology at Miami Children's Hospital. Moreover, Dr. Crown has twenty-nine years of academic and clinical experience in brain injury, mental retardation, and cerebral palsy. In Cruz, a 2000 decision, the neuropsychologist's study of the brain dated from 1964. The Fourth District detailed her expertise:
[S]he was involved in considerable research and experimentation concerning the effects of various visual stimuli on the brain, the effects of gravity on the brain and the effects of other forces in the brain. She continued her study of neuropsychology, focusing primarily on fetal brain and spinal cord surgery. She taught neuro-ophthalmology, and served as a consultant in a major hospital to the departments of neurosurgery, neurology and endocrinology. She explained that her work frequently requires her to consult and work side by side with neurosurgeons, neuropathologists, neuroophthalmologists and neuroradiologists.
761 So.2d at 395.
In this case, Dr. Crown's opinion was not being offered to establish whether there was a deviation from the medical standard of care. Dr. Crown was qualified to give and should have been able to give his opinion on the cause of Jacob's brain damage because that opinion was based on his background, training and experience, and the results of the testing that he performed. There was a solid basis for Dr. Crown's opinion as to how Jacob's brain damage occurred and why it was more likely that Jacob's brain damage occurred at birth rather than during an earlier stage of fetal development, as the defense contended.
Accordingly, although I agree with the majority's rejection of section 490.003(4), Florida Statutes, as support for the proposition that a neuropsychologist can testify to causation, I cannot agree with either the majority's categorical rule that a neuropsychologist *1011 can never testify as to the cause of brain damage or the majority's approval of the alleged conflict cases to the extent they adopt such a rule. See GIW Southern Valve Co. v. Smith, 471 So.2d 81 (Fla. 2d DCA 1985); Bishop v. Baldwin Acoustical & Drywall, 696 So.2d 507 (Fla. 1st DCA 1997). Thus, I would approve the Fourth District's opinion in full and its reasoning both in this case and in Cruz.
ANSTEAD, C.J., concurs.
WELLS, J., concurring in part and dissenting in part.
I agree with the majority's approval of the decisions in Bishop v. Baldwin Acoustical & Drywall, 696 So.2d 507 (Fla. 1st DCA 1997), and GIW Southern Valve Co. v. Smith, 471 So.2d 81 (Fla. 2d DCA 1985). I also concur with the majority's holding that:
[T]he record reflects that Dr. Crown, the plaintiff's expert neuropsychologist, did testify regarding [plaintiff-child] Jacob's standardized test results, and rendered an expert opinion that they reflected Jacob's organic brain damage. Thus, the neuropsychologist was permitted to testify with regard to the etiology (brain damage) of the behavior he evaluated. He should not have been permitted to testify as to the medical causation of the organic brain damage itself.

... Contrary to the district court's decision, the trial court here did not err in disallowing the opinion testimony of someone other than a qualified physician as to the medical causation of Jacob's brain damage.
Majority op. at 1003-04 (emphasis added) (footnote omitted). However, I disagree with and dissent from the majority's decision to approve the result of the district court's decision, which reverses the trial court for not admitting the neuropsychologist's proffered opinions.
In this instance, the trial court adhered to the law, which the majority opinion correctly finds to be controlling. However, in the present case, the district court reversed the trial court for not admitting the following proffered testimony by Dr. Crown:
Q. [Plaintiffs' counsel]. Can you rule out injury occurring during the 24- to 34-week period?
A. [Dr. Crown]. Yes, to the extent thatthat his functioning includes those aspects of the brain that are the last to develop; and, in fact, his highest score on object assembly involves that kind of visual motor processing, yes.
Q. As a neuropsychologist, how can you do that?
A. As I said, there are functions that were tested that he scored
Actually, his highest score on one test was in that area, and that's the last area of the brain that actually develops.
Q. Do you have an opinion within a reasonable degree of neuropsychological probability as to whether Jacob sustained a hypoxic injury at the 24- to 34-week period?
A. I believe that it was after that.
Q. And the basis for that opinion, sir?
A. The basis is that there appears to be an intact brain based on neuropsychological functioning, that there wasn't a delay in total brain development, and that, in fact, rather than a delay, there's an impairment and that would have come much later in the process.

Q. More likely than not was Jacob's injurydid Jacob's injury occur during the intrapartum period when Dora was at Bennett Hospital on May 11th?
A. Yes.

*1012 Q. More likely than not did Jacob's injury not happen during the 24- to 34-week period?
A. It is most likely that it did not happen, yes.
Q. "Intrapartum," itself, means what?
A. Birth. At birth. In the birthing process.
(Emphasis added.)
Crown's proffered opinion appears to me to be an opinion regarding the timing of the hypoxic event, with the stated basis for the opinion being the status of brain development in utero at the time the event occurred. The record indicates in the testimony of Dr. Crown that "neuropsychology is the area that specifically addresses how the brain works, how it functions, and how that relates to behavior." (Emphasis added.) On the other hand, the record demonstrates that Lawrence Schneck, M.D., a neurologist called by the plaintiff, and Robert C. Vannucci, M.D., a neurologist called by the defendant, testified that the physiology of brain damage in utero is within the expertise of neurology based upon medically peer-reviewed studies and radiological and hematological tests which are regularly used and read by these medical doctors.
Moreover, no case has been cited by the respondent, the majority, or Justice Pariente, nor has my individual research located any case from any jurisdiction which has held that a neuropsychologist is qualified to testify as to the timing of a hypoxic-ischemic insult in utero. I conclude that this stems from the field of psychology being related to behavior, and behavior is not studied or known in utero. There are numerous reported cases which recognize the testimony of pediatric neurologists on the discrete issue of timing of brain damage in utero. It is this discrete issue which is the focus of the present case.
The record reflects that the trial court allowed both the plaintiffs and the defendants to present the testimony of a pediatric neurologist regarding the medical status of the plaintiff child's brain development in utero. On the basis of this record, I would find that the trial court did not abuse its discretion in relying on the then-existing law in denying the proffered testimony. Nor do I believe, even if the case law in the Fourth District changed from Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA 1985), to the rule set out in Broward County School Board v. Cruz, 761 So.2d 388 (Fla. 4th DCA 2000), that the trial judge abused his discretion in not allowing this testimony by the neuropsychologist since there was no evidence in the record that the substance of this opinion came within the expertise of psychology.
Even if the trial court could be found to have erred in respect to sustaining the objection to Dr. Crown's proffered testimony, any error would be harmless based upon an examination of the entire record in this case. See § 59.041, Fla. Stat. The trial court admitted testimony presented by the plaintiff as to the causation and timing of the brain injury in utero by Dr. Schneck, a neurologist, and Dr. Gatewood, an obstetrician. The defendants had one expert, Dr. Vannuci, a neurologist.
I dissent from reversing the trial judge. I would affirm the final judgment.
CANTERO, J., and SHAW, Senior Justice, concur.
NOTES
[1] Section 490.003(4), Florida Statutes (1997) (defining the practice of psychology), provides:

(4) "Practice of psychology" means the observations, description, evaluation, interpretation, and modification of human behavior, by the use of scientific and applied psychological principles, methods, and procedures, for the purpose of describing, preventing, alleviating, or eliminating symptomatic, maladaptive, or undesired behavior and of enhancing interpersonal behavioral health and mental or psychological health. The ethical practice of psychology includes, but is not limited to, psychological testing and the evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, aptitudes, and neuropsychological functioning, including evaluation of mental competency to manage one's affairs and to participate in legal proceedings; counseling, psychoanalysis, all forms of psychotherapy, sex therapy, hypnosis, biofeedback, and behavioral analysis and therapy; psychoeducational evaluation, therapy, remediation, and consultation; and use of psychological methods to diagnose and treat mental, nervous, psychological, marital, or emotional disorders, illness, or disability, alcoholism and substance abuse, and disorders of habit or conduct, as well as the psychological aspects of physical illness, accident, injury, or disability, including neuropsychological evaluation, diagnosis, prognosis, etiology, and treatment.
[2] While the legislative summary reflects that a definition of the practice of psychology (which was previously contained in chapter 64B19 of the Florida Administrative Code) would now be contained in the statute, there is no mention of any substantive change to that definition.
[3] Prior to the trial court's ruling, Dr. Crown had already specifically testified that Jacob's brain damage "was brought about by an oxygen deprivation experience at the intrapartum level or in the neonatal period." This testimony was not stricken. In fact, the trial judge, in ruling that Dr. Crown could not testify regarding medical causation, stated:

THE COURT: I've excluded the doctor's opinion because he's not and hasn't been presented to be a medical doctor; and based on the case law that's furnished to me, it's the doctorThis is not a medical doctor. The Court should not have allowed him to testify as to the physical cause or contributions to the cause of the damage.
[4] In fact, here, Dr. Schneck, a neurologist testifying on the Tomlians' behalf, stated that Jacob "underwent a very detailed psychoneurological examination" involving detailed standardized tests. Dr. Schneck indicated that such tests are "performed by psychologists, but we rely upon the results and our own observations and examination to come to a conclusion." (Emphasis supplied.)
[5] The record reflects that the Tomlians did present the expert testimony of medical doctors regarding this issue. Dr. Gatewood, an obstetrician who testified as a standard of care expert, stated that "except for the deviations that occurred, had the management been appropriate, Jacob would have been born normal." Dr. Schneck, a neurologist who also testified as an expert witness for the Tomlians, gave his opinion, based upon "[a]ll of the different things the [he] saw with Jacob, all the things that were other than normal," that the "cause of all of those things" was "due to perinatal, around the time of birth, hypoxic, decreased oxygen, ischemic, decreased blood flow, to the brain."
[6] Alternatively, I would discharge jurisdiction and allow the Fourth District's decision in this case to stand. This Court had a previous opportunity to decide this issue when the Court accepted jurisdiction in Broward County Sch. Bd. v. Cruz, 761 So.2d 388, 395 (Fla. 4th DCA 2000), approved, 800 So.2d 213 (Fla. 2001). Although jurisdiction was based on a different certified question, the Court had jurisdiction to decide the issue we decide today, but did not even refer to this aspect of the Fourth District's decision. See Cruz v. Broward County School Bd., 800 So.2d 213 (Fla. 2001). The alleged conflict cases that this Court relies on to accept jurisdiction existed at the time of this Court's decision in Cruz. The 1985 case from the Second District, GIW Southern Valve Co. v. Smith, 471 So.2d 81, 82 (Fla. 2d DCA 1985), simply relies on Executive Car & Truck Leasing, Inc. v. DeSerio, 468 So.2d 1027 (Fla. 4th DCA 1985). The other case from the First District Court of Appeal is a workers' compensation case involving a psychologist where there was no medical evidence of any brain damage. See Bishop v. Baldwin Acoustical & Drywall, 696 So.2d 507 (Fla. 1st DCA 1997). There is no discussion of the psychologist's training and expertise but a mere statement in the order of the workers' compensation judge that relies on the statement in DeSerio. See Bishop, 696 So.2d at 510.
[7] Section 90.702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
(Emphasis supplied.)
[8] Dr. Crown, who was eminently qualified and well trained, testified that objective tests, demonstrating which tasks Jacob could and could not perform well, indicated that the injury to Jacob's brain could not have occurred in an early gestational period. According to Dr. Crown, the regions of the brain that control the functions Jacob could perform were completely developed when the injury occurred. Poor performance by Jacob on other tasks confirmed an abrupt impairment rather than an early developmental delay.
[9] Interestingly, in DeSerio, the Fourth District, relying on cases from this Court, observed that at times it is not even necessary to require expert testimony on the issue of causation where the inference is warranted when a plaintiff is symptom-free prior to an accident and suffers disability following the accident:

Medical testimony, however, is not always necessary to show causation between an occurrence and the damages alleged to be caused by that occurrence. E.g., Clark v. Choctawhatchee Electric Co-operative, 107 So.2d 609 (Fla.1958). In Clark, our supreme court held that medical testimony was not necessary to support a verdict in favor of a plaintiff alleging personal injury. The court stated that when an injured person was free of the symptoms at issue immediately before a damaging occurrence, and when the injury followed that occurrence very closely, "the conclusion of relationship between them [is] inescapable." Id. at 612. See Lyng v. Rao, 72 So.2d 53 (Fla.1954) (causation inferred when plaintiff struck by lightning, and disabilities that did not preexist striking by lightning immediately appeared).
. . . .
In the instant case, DeSerio received severe head injuries at the time of the accident, and was in a coma when she was taken to the hospital. Her neurosurgeon treated her for debilitating headaches, left-sided numbness, unsteadiness, and difficulty with her memory. He testified that she had all the symptoms of a severe concussion and probable contusion of the right cerebrum causing hemiparesis and sensory disturbances on her left side. Her recovery was slow and incomplete, and although the indications of brain damage seemed to clear up on gross neurological examination, they persisted symptomatically and DeSerio still appeared to have sufficient brain damage to disable her and cause her to feel unsteady and unsafe on her own. It was for these reasons that the neurosurgeon referred DeSerio to Dr. Bessette. DeSerio and others testified that she had none of these problems prior to the automobile accident in question, and that these problems occurred immediately and continually after the accident. The inference that the brain damage was traceable back to the collision is warranted under the facts of this case where the disability followed the accident in an obvious sequence. Accordingly, we find that Dr. Bessette's improper testimony [as to causation] was not necessary and that it constituted harmless error.
468 So.2d at 1030.