# Third District Court of Appeal
## State of Florida

Opinion filed April 28, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D18-2188
Lower Tribunal No. 11-23730
_____

**Royal Caribbean Cruises, Ltd.,**
Appellant,

vs.

**Lisa Spearman,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Reemberto Diaz, Judge.

Holland & Knight, LLP, and Rodolfo Sorondo, Jr. and Rebecca M. Plasencia, for appellant.

Colson Hicks Eidson, P.A., and Deborah J. Gander and Susan S. Carlson; Meister Law LLC, and Tonya J. Meister, for appellee.

Before LOGUE, HENDON, and GORDO, JJ.

HENDON, J.

Royal Caribbean Cruises, Ltd. ("Royal Caribbean") appeals from a $20.3 million final judgment entered in favor of Lisa Spearman ("Spearman") on her counts for Jones Act negligence and unseaworthiness. We affirm the jury's finding of liability against Royal Caribbean and in favor of Spearman, but as the trial court failed to consider the factors set forth in section 768.74(5) of the Florida Statutes, as it was required to do when ruling on Royal Caribbean's motion for remittitur, we remand with instructions for the trial court to conduct a new hearing on the motion for remittitur to address these factors.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Operative Complaint*

In 2011, Spearman filed suit against Royal Caribbean for crush injuries sustained to her right hand in August 2008 while a crewmember on the *Voyager*. The injuries occurred when her fingers got caught in the "pinch point" of a Semi-Watertight Door ("SWTD"), specifically an "A-60 Single Leaf Sliding Door" ("A-60 SWTD"), as the door was retracting back into the bulkhead (wall) after a Royal Caribbean nurse improperly overrode Bridge Control during a safety drill.[1] Spearman alleged that she has since been

---

[1] The A-60 SWTD prevents the spread of both fire and water by forming a water-resistant seal against the adjacent bulkhead (the wall) when the door is closed. This door is capable of preventing the spread of water and fire for

diagnosed with Complex Regional Pain Syndrome ("CRPS") and Post-Traumatic Stress Disorder ("PTSD"). In the operative complaint, Spearman asserted two causes of actions against Royal Caribbean that were later presented to the jury and specifically addressed by the jury in the verdict form—Jones Act negligence and unseaworthiness.[2]

### B. *Pretrial Motions in Limine*

#### i. Alternative Design for the A-60 SWTD

Prior to trial, Royal Caribbean filed a motion in limine to exclude the testimonies of Spearman's liability experts, Eric Van Iderstine ("Van Iderstine"), a mechanical engineer, and John W. Sullivan ("Sullivan"), a marine engineer, regarding an alternative design for the A-60 SWTD that Van Iderstine created for the sole purpose of this litigation using Computer Assisted Drawing software ("CAD prototype" or "CAD model"). According to Van Iderstine, the CAD prototype is a safer alternative design because it includes a cutout that eliminates the pinch point, and therefore, a person's hand can safely remain on the door handle when the door retracts into the bulkhead (wall). In addition to reshaping the door frame, the CAD prototype

---

sixty minutes.

[2] Spearman withdrew the remaining causes of action prior to the commencement of trial.

also requires the reshaping of the door and a gasket. The purpose of the gasket is to prevent the spread of water and smoke into other compartments. Van Iderstine's CAD prototype also included the addition of a second crash bar and sensor. Royal Caribbean does not design or manufacture the safety doors installed on any of its ships. A safety door such as the CAD prototype, which was designed by Van Iderstine several years after Spearman's accident, did not exist at the time of the accident and such a door has not been manufactured, tested, or approved by the regulatory entities governing the shipping/cruise line industry as of the date of this appeal.

In opposition to the motion in limine, Spearman submitted Van Iderstine's affidavit, which provides, in part, as follows:

12. In my positions as Machine Design Engineer and as Mechanical Engineering Manager, I personally performed engineering design of mechanical components and systems using the same engineering principles and techniques used in the design of the subject semi-watertight sliding fire door on the *Voyage [sic] of the Sea* cruise ship.

13. In my position as a Machine Design Engineer, I created engineering drawings of complex mechanical systems, as well as detailed component drawings, as a routine part of the machine design and manufacturing process. These included welded structural assemblies manufactured using the same methods as was used in the construction of the subject semi-watertight sliding fire door.
. . . .

21. I . . . did prepare a computed [sic] aided design (CAD) model of a modified subject-type sliding door assembly. . . . I identified

4

that an unguarded pinch point existed when the recessed pocket and door handle passed into the doorframe. . . . I determined that the hazard could be addressed by a design change and by guarding the hazardous area of the door and doorframe. The CAD model depicted changes to the right side of the door that would eliminate the pinch point hazard that injured Ms. Spearman by changing the shape of the right-side of the door, right-side door frame, and right-side seal. There are no restrictions in the International Convention for the Safety of Life at Sea (SOLAS) that prevents engineering design changes to enhance safety. . . .

 . . . .

23. In the defense's motion to limit my testimony (Section VII – 7), the defendant is critical of my alternate design due to a lack of testing of the design I proposed. As a design engineer, I have reviewed the engineering drawings, documents, and photographs of the existing subject door and produced a CAD model (Exhibit 4) of an alternate design that simply changes the shape of one portion of the door and door frame. I have accounted for the ability of the door to continue to provide a seal using the same cross-section seal as is currently in use and have opined that the modifications to the existing design use the same construction techniques as are currently in use. The design I propose would not adversely impact the stiffness or soundness of the existing design, and my opinion is to a reasonable degree of mechanical engineering certainty that the alternate design would eliminate the hazard while providing the current level of leakage resistance and fire protection. . . .

24. In the defense's motion to limit my testimony (Section VII – 9), the defendant is critical of my alternate design as being novel and not currently being manufactured or approved by the DNV. The alternate design that I have proposed utilizes the same materials and method of construction as the subject semi-watertight door and, based on widely accepted mechanical engineering principles, would offer similar levels of performance to the existing door, but no longer have the hazard that injured Ms. Spearman. The alternate design I have proposed only changes the shape of the right-hand side of the door and the door

5

frame as viewed while departing the medical facility. I have reviewed photographs that were part of my case file of cruise ship doors that have cutouts on the door frame that allow for the hand of a person to be on the handle of a sliding door when it opens. The use of a modified door frame is not novel and is in use on ship doors to provide an increased level of safety and risk mitigation. Had the level of safety been present on the subject semi-watertight door, Ms. Spearman's hand would not have been pulled between the door and door frame. . . .

25. In the defense's motion to limit my testimony (Section VII – 10), the defendant states that I am "aware of no door that is presently manufactured which meets the FTP code approval with a design similar to the one proposed in his CAD drawing." As I have stated above, the use of cutouts on ship doors is not a novel idea. Additionally, Parmarine, the manufacturer of the subject door, markets A-60 SWTDs that have cutouts in the door itself so that ducts or hoses can be in the doorway while still allowing the door to open and close. . . .

. . . .

28. In the defense's motion to limit my testimony (Section VII - 15), the defendant states, "Mr. Van Iderstine is aware of no door in use today aboard oceangoing ships that incorporates a crash bar device on the door frame." This statement is misleading as it relates to the issue of addressing the pinch point hazard that injured Ms. Spearman. . . . The actual subject door that injured Ms. Spearman incorporated a crash bar on the moving portion of the door. My alternate design to guard the pinch point hazard that injured Ms. Spearman would simply add a second crash bar on the right side door frame that would provide the same level of protection to a person whose had is on the door handle as the current crash bar offers to the person or object that in contacts. My proposed alternate design, whether it is referred to as a proximity sensor or crash bar, is based on widely acceptable engineering methods, physics, and mechanical engineering design.

In addition to Van Iderstine's affidavit, Spearman also submitted

6

Sullivan's affidavit, which was filed after he reviewed Royal Caribbean's motion in limine and Van Iderstine's deposition and exhibits. Based on industry standards and his experience and education, Sullivan opined as follows:

> In defense's Motion in Limine to exclude Eric Van Iderstein's [sic] testimony defendants cite that the door re-designed by Iderstein [sic] is not "feasible" because the door did not undergo the testing and approval procedures necessary for getting a modification of an existing piece of equipment in order to have it approved by a Classification society. I disagree. It is feasible. There is a normal and routine process that can be carried out in a timely manner in order to get the modified design approved by Class.
> . . . .
>
> The modification to the incident type door in the Spearman case proffered by Iderstein [sic] is a reasonable modification available for safety that would have prevented the incident.

The trial court denied Royal Caribbean's motion in limine, but ruled that Royal Caribbean could cross-examine the experts as to the CAD prototype.

## ii. Dr. Anthony Kirkpatrick's Testimony as Speculative

Royal Caribbean also moved in limine to preclude portions of Dr. Anthony Kirkpatrick's testimony regarding future medical damages, including lifetime "attendant care," as the testimony was speculative. In his deposition, Dr. Kirkpatrick, who is an expert on CRPS, testified that Spearman may require "attendant care" twenty-four hours a day, seven days a week, because Spearman may become totally dependent and confined to a

7

wheelchair. Dr. Kirkpatrick testified that there is a treatment available—ketamine infusion treatment—which he recommended Spearman undergo. However, because Spearman's CRPS has been ongoing for almost ten years, "it's going to be very difficult to reverse the clinical course of this disease, but I think there can be significant improvement made [with the ketamine infusion treatments.] . . . . So definitely she's not at maximum medical improvement, okay? There's just no way to say that at this point in time." Dr. Kirkpatrick also stated that he is "optimistic, and [Spearman] should be optimistic, but we don't know. We don't know." Dr. Kirkpatrick testified that with the ketamine infusion treatments, he's "confident we're going to get her pain down, you know, because we've done enough of these we can predict that." Following a hearing, the trial court denied Royal Caribbean's motion in limine.

### C. *Jury Trial*

Spearman presented evidence, requested jury instructions, and argued in opening and closing statement that Royal Caribbean was negligent and/or provided an unseaworthy ship based on four distinct theories of liability: (1) the A-60 SWTD could have been designed to eliminate the "pinch point"; (2) Royal Caribbean failed to train the ship's crewmembers on how to avoid the SWTD's "pinch point"; (3) the A-60 SWTD lacked a warning

sign or sticker regarding the "pinch point"; and (4) the nurse involved in the incident was negligent when she improperly overrode Bridge Control during the safety drill.

The evidence presented at trial showed that the *Voyager* has three types of safety doors—watertight doors ("WTD"), fire doors, and SWTDs—and that Royal Caribbean does not design or manufacture these doors. Spearman's testimony reflects that she received training on WTDs and fire doors, but not on SWTDs. Further, she was not told that the manual of the A-60 SWTD warns that "the speed of the opening movement is very fast, watch for fingers. You may lose them." During her training on a WTD, Spearman learned that a threshold flips up when the door is under Bridge Control, and to override Bridge Control, the handle must continuously be held down. If the handle is not continuously held down, the WTD will close and has the capability of severing a large bone. In contrast, to override Bridge Control of a fire door, the door will start to retract into the bulkhead (wall) once the handle is pressed down, will continue to retract even when the handle is released, and will bounce back when it hits an obstruction. Unlike a WTD, a fire door does not have a threshold that flips up when under Bridge Control, whereas a SWTD does have a threshold that flips up. Overriding Bridge Control of a SWTD is somewhat similar to overriding Bridge Control

9

of a fire door.  Although Bridge Control of a safety door can be physically overridden, crewmembers are prohibited from doing so during safety drills.

At trial, the evidence showed that Spearman's injuries to her hand and fingers occurred when fingers on her right hand were pulled into the "pinch point" of the A-60 SWTD.  While the *Voyager* was undergoing pre-cruise preparation safety drills in Barcelona, Spain, there was an announcement over the loudspeakers indicating that a safety drill would be commencing. When the safety drill commenced, the safety doors, including the A-60 SWTD at issue, were placed under Bridge Control and closed.  During the safety drill, Spearman approached the closed A-60 SWTD and stood by the door.  While standing there, Spearman noticed that the handle on the door went down and the door began to open.  At that moment, a nurse began to walk through carrying boxes, and she tripped on the rising threshold flap and lost her balance.[3]  With her left hand, Spearman reached out to steady the nurse, and with her right hand, Spearman pressed and held down the handle because she believed the nurse would get severely injured if the handle was released.  As Spearman continued to press down the handle, the door

---

[3] The facts are taken in the light most favorable to Spearman as the prevailing party.  Royal Caribbean's position was that Spearman, not the nurse, overrode Bridge Control of the A-60 SWTD at issue.  Spearman, however, testified that it was the nurse who overrode Bridge Control by pressing down on the handle of the A-60 SWTD.

continued to open, retracting into the bulkhead (wall). Spearman's right hand went into the bulkhead (wall) and several of her fingers got caught in the pinch point. Initial efforts to free Spearman's hand and fingers from the bulkhead were unsuccessful. After a few minutes, the Bridge remotely closed the door, freeing Spearman's fingers from the pinch point. Spearman did not recall seeing any of the markings and instructions that were on the door and did not pause to consider the type of door. Although the door had markings indicating it was a safety door and instructions on how to open the door, the door did not have any sort of warning sticker indicating that if the handle is not released, a person's hand could be caught in the pinch point. During trial, Spearman also presented evidence that Royal Caribbean had twelve prior similar incidents fleetwide during a three-year period.

Following the incident, Spearman was treated at a hospital in Barcelona for several days, and she eventually returned to her home in New Zealand where she continued to be treated and received numerous therapies. Despite the treatments and therapies, Spearman never fully recovered, and in February 2010, one of her physicians declared that she had achieved maximum medical improvement. Spearman did not return to work because she was not capable of lifting fifty pounds, which is a requirement for all crewmembers.

Spearman presented testimony relating to her training on safety doors at Royal Caribbean, the incident, her treatments, and her limitations and pain. Spearman testified that she has been diagnosed with CRPS, which has spread to other parts of her body, and to several CRPS symptoms, including shiny or waxy skin; an abnormal sweating pattern; extreme sensitivity, such as a breeze causing pain; and a change in the skin temperature that requires her to wear a glove on her right arm. Spearman wore a glove during her trial testimony and in the video of her medical examination by Royal Caribbean's medical examiner.

During a break in Spearman's testimony after she testified as to a statement made by a security officer onboard the *Voyager* regarding prior similar incidents, the jury asked the trial court the following question: "How much would it cost for Royal Caribbean to modify the door, and why wasn't it done[?]" The trial court informed the jurors that it would address the question at the appropriate time.

In addition, several doctors and experts testified on Spearman's behalf, including Dr. Kirkpatrick, who is an expert on CRPS. The testimony reflects that as a result of the accident, Spearman suffers from PTSD, CRPS, which has spread beyond the injured hand, and panic attacks. Dr. Kirkpatrick explained that Spearman has met the following criteria for a CRPS diagnosis:

12

(1) a noxious event or injury that does not follow the normal healing course, (2) there is evidence of abnormal function of the sympathetic nervous system at some point in time, and (3) "differential diagnosis" ruling out other possible explanations. Dr. Kirkpatrick testified that he diagnosed Spearman with CRPS based on objective findings, such as the physical appearance of her right hand, the difference in temperature between her two hands, abnormal sweating patterns, sensitivity to light touch, swelling, "goose flesh," and skin discoloration. Further, although there was a gap in examinations between 2009 and 2013, Dr. Kirkpatrick explained that the symptoms of CRPS "wax and wane." Dr. Kirkpatrick's testimony reflects that Spearman's CRPS was initially in her injured hand, but has since spread to other parts of her body and to the left side of her body. As to Spearman's prognosis related to CRPS, Dr. Kirkpatrick testified as follows:

> **A.** My opinion is that it is – it is unlikely given what we know that she is probably going to get cured. But within a reasonable degree of medical probably [sic], more likely than not, we're going to help her improve the quality of her life.
> In medicine, we use the term "palliative care," improving the quality of life; less pain, more function, better mental status, emotional being, sense of well-being. I'm confident that that's going to happen.
> **Q.** And would now be the time where you can tell us how you think you're going to do that? How based on your training and your clinical studies do you believe you will be able to help Lisa Spearman?
> **A.** Yes. Based on not just the clinical experience but the research we've been doing over the past decade, that I think her

13

best solution now is the ketamine. That – we've had many patients similar to her situation and we have helped them enormously, okay.

And now, I want to – I want to emphasize that it's variable. Some patients we treat and may never see them again. They're fixed. Others, they go on and they don't improve. In fact, some don't do so well.

Those are the – those are not the common scenario, but that can happen for sure. But I don't anticipate a cure in this situation.

Cure, by the way, that word is used so let me define what I mean.

Q. What does "cure" mean –

A. Yeah, sure.

Q. – as you are using it?

A. In the field of medicine, we often talk about cure as it relates to cancer. If you put a patient in remission for five years without return of their symptoms from the cancer, we call that a cure. It's arbitrary, but that's just what we – the way we frame it usually.

Q. Are you able in any way to quantify how much better you think the ketamine will make her?

A. Just as I described. In only qualitative terms, I believe that she will have a better sense of well-being. Well-being – just it's hard to – just – you look forward to sunshine and you look forward to this. You're hopeful and life is opening up. Better function, better activities of daily living, less pain.

Q. And do those three things combine to create less emotional stress caused by the condition?

A. Oh, yes.

Q. Are those your opinions within a reasonable degree of medical probability?

A. Yes.

Dr. Kirkpatrick testified as to a surveillance video taken by Royal Caribbean of Spearman, which was later introduced by Royal Caribbean, in which Spearman utilized her right hand to do various activities. He stated

14

that those activities are the type of activities that he encourages patients with CRPS to engage in. Dr. Kirkpatrick then testified as to the life care plan submitted by Darlene Carruthers that was based, in part, on his recommendations.

Spearman also presented the testimony of Darlene Carruthers, who is a vocational rehabilitation counselor and life care planner. Based on recommendations made by several health care professionals, Carruthers testified as to the type, frequency, and cost of treatments, therapies, equipment, and services Spearman would need during her forty-year lifespan as a result of her injuries. Carruthers testified that Dr. Kirkpatrick recommended that Spearman receive "attendant care" services, which is a personal caregiver[4], at a frequency of twelve hours per day and up to twenty-four hours per day on an as-needed basis. Carruthers also testified to the cost of five ketamine infusion therapies, totaling $75,000, which includes the cost of travel from New Zealand to Tampa.

Spearman presented the testimony of a forensic economist, Gary Allen Anderson, who assessed the economic loss associated with Spearman's

---

[4] Carruthers testified that Dr. Kirkpatrick testified in his April 2017 deposition that Spearman "may need attendant care 24 hours a day seven days a week." She contacted Dr. Kirkpatrick by phone to clarify, and he told her to "put 12 hours and up to 24 hours as needed" and that the "up to 24 hours per day" would depend upon the point at which the CRPS had progressed.

injury. The predicate for his economic loss calculations was Carruthers' opinions and recommendations in her plan as to the type of care, the frequency of care, and the cost of care. Anderson testified that his calculations did not allocate any money to items included in Carruthers' plan if the plan stated, "if needed." Therefore, for attendant care, his calculations only included twelve hours per day, not twenty-four hours per day. Anderson testified that the present value of Spearman's future medical care is $6,166,467.

Over Royal Caribbean's objection, Van Iderstine and Sullivan testified as to the CAD prototype Van Iderstine created for purposes of litigation, explaining that Spearman's injuries could have been avoided if the A-60 SWTD had cutouts as proposed in the CAD prototype. Royal Caribbean's counsel vigorously cross-examined Van Iderstine and Sullivan.

Royal Caribbean presented a surveillance video of Spearman taken during several days in December 2017 and January 2018.[5] The video showed Spearman participating in daily activities, such as grocery shopping and tending to her children. The video also showed Spearman using her right hand to put on her seatbelt, drive, carry her children, take out her cellphone from her back pocket and take pictures, and put a helmet on her

---

[5] The jury trial commenced in May 2018.

child.  Spearman was not wearing a glove in the surveillance video.

The jury was presented with a general verdict form in which the two causes of actions—Jones Act negligence and unseaworthiness—were presented to the jury but did not contain interrogatories as to the four distinct theories of liability.  Royal Caribbean did not object to the verdict form.  The general verdict form asked the jury to answer the following questions:  (1) was there negligence on the part of Royal Caribbean that was a legal cause of damage to Spearman; and (2) was the *Voyager* unseaworthy in any manner that was a legal cause of damage to Spearman.  The jury answered "yes" to both of these questions.  The verdict form instructed the jury that if it answered "no" to both questions, the verdict was for Royal Caribbean, but if it answered "yes" to either or to both questions 1 and 2, to answer question 3, which stated:  (3) Was there negligence on the part of Spearman that was a legal cause of her damage.  The jury answered question 3 "no."  As the jury answered "no" to question 3, the jury was not required to apportion fault between Royal Caribbean and Spearman.  The jury awarded the following damages to Spearman, totaling $20.3 million:  $6,000,000 for past and $6,000,000 for future bodily injury and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life; $7,000,000 for future medical

17

expenses; $500,000 for lost earnings; and $800,000 for lost earning capacity.

### D. *Post-trial Motions*

Royal Caribbean filed a post-trial motion for new trial or remittitur, arguing, in part, that the jury's award indicates it is the result of bias, prejudice and passion against Royal Caribbean; the jury's verdict indicates it misconceived the standard of care; the jury's verdict is grossly excessive when compared to awards for similar claimed damages; and the jury's verdict was disproportionate to the damages that Spearman sustained.

At the hearing on the motion for new trial or remittitur, Royal Caribbean requested that the trial court remit the total award to $4,466,000. First, Royal Caribbean did not take issue with the $500,000 awarded for lost earnings and the $800,000 awarded for lost earning capacity. Second, Royal Caribbean requested the trial court to remit the $6,000,000 for past and the $6,000,000 for future bodily injury and resulting pain and suffering to $1,000,000 each, for a total of $2,000,000 for non-economic damages. Third, Royal Caribbean requested that the trial court remit the $7,000,000 award for future medical expenses to $1,166,000. In doing so, Royal Caribbean noted that the jury awarded $833,533 more than Spearman requested for future medical expenses. Further, Royal Caribbean asserted

18

that despite not taking issue with the amounts requested for therapeutic evaluations, medical care, therapies, equipment, and transportation, it was taking issue with the amounts requested for "attendant care" for twelve hours per day for Spearman's forty-year lifespan—approximately $5,000,000.

In support of its motion for remittitur, Royal Caribbean submitted, among other things, (1) an exhibit reflecting amounts awarded in other cases involving fractures, CRPS, and PTSD, and (2) an exhibit of cases involving jury verdicts around $20,000,000.  The highest verdict for a case involving fractures, CRPS, and PTSD was $4,974,295, and in that case the plaintiff sustained orthopedic, neurologic, and psychiatric injuries; underwent cervical surgeries; and suffers from CRPS and PTSD.  As to cases with jury verdicts around $20,000,000, the exhibit reflects that plaintiffs in those cases were severely injured—paraplegia; quadriplegia; amputated legs along with severe burns; catastrophic brain damage requiring institutionalization seven days a week for the rest of the plaintiff's life; burns over 62% of plaintiff's body (requiring fifteen skin grafts), hearing impairment, the inability to completely close left eye, and chronic tinnitus; severe brain injury, resulting in the plaintiff only being able to grunt syllables, not being able to walk again, and a reduction in his lifespan by forty years; and brain damage to a four year old.  Relying in part on the surveillance video, Royal Caribbean argued

that the injuries sustained by Spearman were not as severe as the injuries to the plaintiffs who were awarded around $20,000,000 by a jury.

In arguing that Spearman's injuries were not as severe as the injuries sustained by the plaintiffs who recovered around $20 million, Royal Caribbean's counsel argued that the surveillance video reflects that Spearman is "living her life, enjoying her life with her family." The videos reflect, among other things, that she is capable of driving an automobile, caring for her child,[6] and using her hands, including her injured hand, to hold items, open the car door, put her child in the car, and use her cellphone to take photos of her child.

At the conclusion of the hearing, the trial court denied the motion for new trial, but granted, in part, and denied, in part, Royal Caribbean's motion for remittitur, reducing the jury's award for future medical expenses by $833,533 (from $7,000,000 to $6,166,467).[7] In ruling on the motion for remittitur, the trial court stated: "I am a firm believer of the right to a trial by jury. I am a firm believer of the jurors' work. I am – I don't have a sufficient

---

[6] Following the accident, Spearman met her partner and gave birth to two children.

[7] The trial court reduced the future medical expenses to $6,166,467 because, as stated earlier, that was the amount Spearman's counsel requested the jury to award based on Anderson's testimony.

grasp of the CRPS syndrome to pass judgment on it." The trial court provided the parties with the option to reject or accept the remittitur. Royal Caribbean rejected the remittitur in order to pursue the instant appeal. The trial court entered a final judgment in accordance with the jury's verdict. Royal Caribbean's appeal followed.

## II. ANALYSIS

*A. Whether the trial court abused its discretion in declining to remit the jury's $20.3 million award?*

Royal Caribbean argues that the trial court abused its discretion in denying, in part, its motion for remittitur. See R.J. Reynolds Tobacco Co. v. Webb, 93 So. 3d 331, 336 (Fla. 1st DCA 2012) (holding that an appellate court reviews the trial court's denial of a motion for remittitur for an abuse of discretion). As the trial court was required to consider the factors set forth in the remittitur statute, section 768.74(5), prior to ruling on Royal Caribbean's motion for remittitur, but failed to do so, we remand with instructions for the trial court to conduct a new hearing on the motion for remittitur to address the factors.

Royal Caribbean filed the motion for remittitur pursuant to section 768.74 of the Florida Statutes. Section 768.74(6) states that the Legislature has vested trial courts with the discretion to review the amount of damages awarded by a jury based on a set of criteria, which review will provide "an

additional element of soundness and logic" to Florida's judicial system. Further, section 768.74(1) provides that, upon a proper motion, "**it shall be the responsibility of the [trial] court**" to review the amount of money damages awarded by the jury "to determine if such amount is excessive or inadequate in light of the facts and circumstances which were presented to the trier of the fact." (emphasis added). Section 768.74(5) sets forth the following five criteria the court "shall consider" in determining whether the jury's damage award is excessive or inadequate:

(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;

(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;

(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

We have reviewed the transcript of the hearing on the motion for remittitur, and it is clear that, despite being required to consider the factors set forth in section 768.74(5) when ruling on Royal Caribbean's motion for remittitur, the trial court failed to do so. Rather than considering these factors in ruling on the motion for remittitur, the record demonstrates that the trial

22

court informed the parties that it is "a firm believer of the jurors' work," and that it did not "have a sufficient grasp of the CRPS syndrome to pass judgment on it."  Therefore, we remand this cause to the trial court with instructions for the trial court to conduct a new hearing on Royal Caribbean's motion for remittitur to address the factors set forth in section 768.74(5).[8]

> *B.  Whether under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and section 90.702 of the Florida Statutes, the trial court abused its discretion by allowing expert testimony regarding the CAD prototype?*

Royal Caribbean argues that the trial court abused its discretion by allowing Spearman's liability experts to testify as to the CAD prototype under Daubert, and therefore, it is entitled to a new trial.[9]  Spearman argues that this Court is precluded from addressing this issue under the "two-issue rule."  We agree with Spearman.

> i.  *Whether the "two-issue rule" bars review of the jury's verdict in favor of Spearman?*

The Florida Supreme Court adopted the two-issue rule in Colonial Stores, Inc. v. Scarbrough, 355 So. 2d 1181 (Fla. 1977).  The two-issue rule

---

[8] We take no position as to Royal Caribbean's motion for remittitur.

[9] A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

23

provides that "where there is no proper objection to the use of a general verdict, reversal is improper where no error is found as to one of two issues submitted to the jury on the basis that the appellant is unable to establish that he has been prejudiced."[10]  Whitman v. Castlewood Int'l Corp., 383 So. 2d 618, 619  (Fla. 1980) (noting that the Florida Supreme Court adopted the two-issue rule in Colonial Stores).

In addressing the two-issue rule, the Florida Supreme Court in Barth v. Khubani, 748 So. 2d 260 (Fla. 1999), stated:

> When a general verdict for the plaintiff is on review, the rule is applied by focusing on the causes of action, such that an appellate claim of error raised by the defendant as to one cause of action cannot be the basis for reversal where two or more theories of liability (or causes of action) were presented to the jury.

Id. at 261 (footnote omitted).  The two-issue rule "is based on the principle that reversal is improper when no error is found as to one of the issues that can independently support the jury's verdict."  Id. at 261 (citing Colonial Stores, 355 So. 2d at 1186 ).  The two-issue rule is applicable if the jury could have ruled on a theory of liability that is not affected by an issue raised on

---

[10] In its reply brief, Royal Caribbean correctly stated that the jury verdict was a "general verdict form."  See Turner v. Fitzsimmons, 673 So. 2d 542, 534 n.1 (Fla. 1st DCA 1996) ("A special verdict, as distinguished from a general verdict, is one in which the jury in a civil case resolves the disputed facts in separate findings based on the evidence presented to it, referring the decision on the facts found as a matter of law to the court.").

24

appeal.  See Chua v. Hilbert, 846 So. 2d 1179, 1182 (Fla. 4th DCA 2003).

As stated earlier, within her two causes of actions—Jones Act negligence and unseaworthiness—Spearman presented four theories of liability—defective design of the A-60 SWTD; negligent training; failure to warn, such as a warning sticker on the door; or negligence of the nurse improperly overriding Bridge Control.  The general verdict form required the jury to resolve the two causes of actions, but did not require the jury to indicate which alternate theories were resolved in favor of which party.  See Marriott Int'l, Inc. v. Perez-Melendez, 855 So. 2d 624, 627 (Fla. 5th DCA 2003) (applying the two-issue rule after noting that "[e]ncased within the same count of the complaint are four separate theories of liability"); Variety Child.'s Hosp., Inc. v. Perkins, 382 So. 2d 331 (Fla. 3d DCA 1980) (holding that because the general verdict form does not reveal whether the jury found against the hospital because of the actions of the residents, the nurses, or both, this Court was "compelled conclusively to presume that the verdict was grounded, at least in part, on the nurses' negligence, as to which it is conceded there was no error committed below").  As such, we conclude that the two-issue rule precludes this Court from reversing on Royal Caribbean's claimed error relating to the admission of expert testimony of the CAD prototype under Daubert.

25

## ii. *Introduction of expert testimony regarding CAD prototype*[11]

Although we concede that the two-issue rule precludes this Court from reversing on Royal Caribbean's claimed error relating to the admission of expert testimony as to the CAD prototype, we nonetheless address the issue because the testimony as to the safer alternative design was a significant part of Spearman's argument relating to Royal Caribbean's liability[12] and because addressing the issue will provide guidance when the issue arises in other similar cases.

Royal Caribbean argued that the trial court abused its discretion by permitting Van Iderstine and Sullivan to testify as to the CAD prototype, arguing that their testimonies do not satisfy the Daubert standard.[13] Although we cannot reverse as to this issue, we agree with Royal Caribbean.

"The proponent of expert testimony must, when properly challenged, establish the basis for its admissibility by a preponderance of the evidence."

---

[11] A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

[12] As stated earlier, the jury asked, "How much would it cost for Royal Caribbean to modify the door, and why wasn't it done[?]"

[13] The Daubert standard is derived from Daubert, Joiner, and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

<u>Baan v. Columbia Cnty.</u>, 180 So. 3d 1127, 1131-32 (Fla. 1st DCA 2015).

Section 90.702 codifies the <u>Daubert</u> standard, setting forth the requirements

to admit expert opinion, and provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Section 90.702, which was amended in 2013, is patterned after Rule 702 of

the Federal Rules of Evidence as amended in 2000.[14]  <u>See</u> Ch. 2013-107,

Laws of Fla. The Florida Legislature's reason for amending section 90.702

was to adopt the standards for expert testimony" as provided in <u>Daubert</u>,

<u>Joiner</u>, and <u>Kumho Tire</u>, and to no longer apply the standard in <u>Frye</u>, and to

prohibit "pure opinion testimony as provided in <u>Marsh v. Valyou</u>, 977 So. 2d

543 (Fla. 2007)[.]"  Ch. 2013-107, Laws of Fla.; <u>see also</u> <u>In re:  Amendments</u>

<u>to Fla. Evid. Code</u>, 278 So. 3d 551, 552-54 (Fla. 2019) (receding "from the

---

[14] As section 90.702 is patterned after Rule 702 of the Federal Rules of Evidence, federal cases are persuasive authority when interpreting section 90.702.  <u>See</u> <u>Vitiello v. State</u>, 281 So. 3d 554, 560 n.8 (Fla. 5th DCA 2019).

Court's prior decision not to adopt the Legislature's <u>Daubert</u> amendments to the Evidence Code").

"<u>Daubert</u>'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge," including those of engineers, as in the instant case. <u>Kumho</u>, 526 U.S. at 141. Under <u>Daubert</u>, expert testimony is admissible if it is both relevant and reliable. <u>See</u> <u>Vitiello</u>, 281 So. 3d at 560. The United States Supreme Court explained in <u>Daubert</u> that the trial court is tasked with being the "gatekeeper" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597; <u>see also</u> <u>Kumho Tire</u>, 526 U.S. at 152 (noting that the purpose of the gatekeeping requirement is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); <u>Sanchez v. Cinque</u>, 238 So. 3d 817, 823 (Fla. 4th DCA 2018) (noting that a "court's gatekeeping function requires more than simply taking the expert's word for it") (internal quotation marks omitted). Under this gatekeeping authority, "[a] trial judge must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or

28

methodology properly can be applied to the facts in issue.'" Kemp v. State, 280 So. 3d 81, 88 (Fla. 4th DCA 2019) (quoting Daubert, 509 U.S. at 592-93); see also Baan, 180 So. 3d at 1133. However, as noted in Daubert, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

The Daubert Court set forth a list of five factors a lower court may consider to determine whether the expert's testimony is reliable: (1) whether the "theory or technique . . . can be (and has been) tested"; (2) whether the theory or technique "has been subjected to peer review and publication"; (3) the "known or potential rate of error" of the theory or technique; (4) "the existence and maintenance of standards controlling [the theory's or technique's] operation"; and (5) whether the theory or technique has "attracted widespread acceptance within a relevant scientific community." Id. at 592-94. These factors do not constitute a "definitive checklist or test." Id. at 593. Further, "an expert's opinion must be based upon 'knowledge,' not merely 'subjective belief or unsupported speculation.'" Kemp, 280 So. 3d at 89 (quoting Daubert, 509 U.S. at 590). However, "rejection of expert testimony under Daubert 'is the exception rather than the rule.'" Vitiello, 281 So. 3d 554, 560 (Fla. 5th DCA 2019) (quoting Fed. R. Evid. 702 advisory

committee's note to 2000 amendment).

In the instant case, at issue is whether the experts' testimony relating to the CAD prototype is reliable.[15]  As such, we address the reliability factors set forth in Daubert.

The experts' affidavits indicate that there has been no testing of the CAD prototype.  We do not take issue with Van Iderstine's theory that the CAD prototype appears to eliminate the pinch point that caused the injuries to Spearman's fingers. This standing alone does not necessarily mean that expert testimony as to the CAD prototype passes the Daubert standard.  We cannot ignore that any SWTD, such as the A-60 SWTD, is not merely a simple door.  Rather, it is a safety door on an oceangoing vessel that must be able to withstand water and fire for sixty minutes to ensure the safety of passengers.  Van Iderstine's affidavit includes conclusory statements that the design of the CAD prototype "would not adversely impact the stiffness or soundness of the existing design," however, he has failed to support his opinion with any type of testing.  Van Iderstine's unsupported speculation is not sufficient to pass muster under Daubert.   See Perez v. Bell S. Telecomms., Inc., 138 So. 3d 492, 499 (Fla. 3d DCA 2014) (holding that

_____

[15] The parties do not dispute that Van Iderstine is qualified as an engineering expert or that his testimony, along with that of Sullivan, is relevant.

30

"[s]ubjective belief and unsupported speculation are henceforth inadmissible"). Van Iderstine stated in his affidavit that the cutout in his alternative design "simply changes the shape of one portion of the door and door frame." Basically, Van Iderstine has attempted to portray his alternative design as a simple change that will not affect the integrity of the door or the door's capability to withstand fire and water for sixty minutes, as required. Before any model of a SWTD can be installed on a cruise ship, the specific model must undergo certain industry testing. The SWTD model is placed in a furnace and must be able to withstand temperature of 1,700 degrees Fahrenheit for sixty minutes before being compromised. The rigorous testing is there for a purpose—to protect the safety and lives of those onboard oceangoing vessels. Sullivan's opinion that the CAD prototype would be "approved by a Classification society" is speculative, at best. In addition, Van Iderstine's alternative design exists only as a CAD prototype, and therefore, it has not been subjected to peer review and there is no information as to the "known or potential rate of error." Finally, Van Iderstine asserted in his affidavit that doors with cutouts exist on cruise ships, and therefore, it is not a novel concept. However, there is not a single SWTD utilized on an oceangoing vessel with a cutout similar to the cutout proposed

31

by Van Iderstine that changes the shape of the door, frame, and gasket.[16]

Thus, based on the analysis of the factors set forth in Daubert, the trial court abused its discretion by allowing Van Iderstine and Sullivan to testify as to the CAD prototype. The inadmissible testimony of Van Iderstine and Sullivan unfairly prejudiced Royal Caribbean, and the error would not have been harmless. See Special v. W. Boca Med. Ctr., 160 So. 3d 1251, 1253 (Fla. 2014) ("[I]n a civil appeal, the test for harmless error requires the beneficiary of the error to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error complained of contributed to the verdict."). As such, although we cannot reverse on this issue based on the two-issue rule, we note that the trial court should not have admitted any testimony relating to the CAD prototype.

---

[16] In paragraph 25 of his affidavit, Van Iderstine asserts that cutouts on ship doors are not novel, referencing an A-60 SWTD manufactured by Parmarine, which is the same manufacture of the A-60 SWTD at issue. Van Iderstine noted that Parmarine "markets A-60 fire doors that have cutouts in the door itself so that ducts or hoses can be in the doorway while still allowing the door to open and close." The A-60 SWTD differs from the CAD prototype because the cutout on the CAD prototype is on the frame of the door, whereas the cutout on the A-60 SWTD is on the bottom of the door itself. The door proposed in Van Iderstine's CAD prototype has never been manufactured, and therefore, never tested to determine that it can withstand temperature of 1,700 degrees Fahrenheit for sixty minutes before being compromised.

The remaining argument relating to Spearman's testimony as to a statement made by a security officer lacks merit and does not warrant discussion.

Affirmed but remanded for further proceedings.

LOGUE, J., concurring.

I fully concur in the majority opinion. I write only to further address why the two-issue rule bars review of Royal Caribbean's challenge to the jury's verdict which underlines the $19,466,467 judgment in this case.

Spearman alleged, presented evidence, requested jury instructions, and argued in opening and closing to the jury regarding her claims that Royal Caribbean was negligent or provided an unseaworthy ship based on four separate theories of liability regarding her crushed right hand: defective design, negligent training, failure to warn, and co-worker's negligence. More particularly, Spearman's four distinct theories were:

- A Semi-Watertight door could be designed to eliminate the "pinch point" or "draw in" hazard;

- Royal Caribbean failed to train the ship's crew on how to avoid the Semi-Watertight door's "pinch point" or "draw in" hazard;

- The Semi-Watertight door at issue lacked a warning sign regarding the "pinch point" or "draw in" hazard; and

- The nurse, whose rescue by Spearman led to Spearman's injuries, was negligent when she improperly opened the door during a safety drill and then tripped over a rising door flap while carrying boxes.

34

Although Spearman presented four separate causes of action, the case was presented to the jury on a general verdict. In our majority opinion, we conclude Spearman's expert testimony that an adequate Semi-Watertight door could be designed without the "pinch point" hazard was speculative and therefore inadmissible.

That conclusion, however, bears only on Spearman's cause of action based on an alternative design of the door. Even if accepted, that argument would not negate the other three theories of liability presented to, and presumably accepted by, the jury. For this reason, appellate review of the jury's verdict is barred by Florida's two-issue rule.

## I.       Facts and Procedural Background

According to Spearman's version of events, which the jury accepted and we must therefore assume is true to the extent it is supported by competent substantial evidence, Spearman's hand was crushed during a safety drill in which the ship's bridge was practicing remote closing of the ship's safety doors, including all of the Semi-Watertight doors. These doors are contained in a recess or pocket on the side of the doorway from which they slide when the doors are closed and sealed. During the drill, the ship's crew members are forbidden to use the doors. Spearman was standing in front of a closed Semi-Watertight door during a drill when the door suddenly

35

opened and a co-worker, a nurse, who had opened the door during the drill contrary to regulations, stepped into the door carrying boxes, and tripped on a flap strip that rises from the floor as the door closes to complete the seal.

Having watched videos of how the closing and sealing of Watertight doors, a related but more powerful door, crushes human bodies, Spearman reacted to the nurse's trip and fall by reaching forward and pressing down the door handle to override the remote door closing. She depressed the handle and kept the handle down as is required for the lever that controls Watertight doors. Unfortunately, the proper practice for Semi-Watertight doors is to depress the handle and immediately remove your hand, as depressing the handle causes the pneumatically powered door to rapidly return to its recess pocket, which it did in this instance, drawing Spearman's hand with it. This "pinch point" or "draw in" hazard was known to Royal Caribbean.

The majority opinion comprehensively discusses the expert testimony regarding the possibility of redesigning the door to eliminate the pinch point. In addition to the evidence of the alleged design defect, however, Spearman presented three other theories of negligence.

Spearman also presented evidence that, whether or not the door could be designed without a pinch point, Royal Caribbean was negligent in failing

36

to train its crew members on how to avoid the hazard. Royal Caribbean trained crew members how to avoid the danger presented by Watertight doors and Fire doors, but not how to avoid the Semi-Watertight door's unique pinch point danger. Spearman introduced training videos showing that a person using a Watertight door must continue to depress the lever to keep the door from closing. The video included an animation of the door crushing a person who attempted to pass through it while the lever was released. But the Semi-Watertight door requires a person to press the handle down and immediately release it to avoid having her hand drawn into the recess.

On this point, Spearman elicited testimony from Captain Paskavlin, a senior Royal Caribbean ship officer, that new employees were brought to and trained on a Fire door and Watertight door but not a Semi-Watertight door. During closing argument, counsel for Spearman reiterated:

> But [the crew] only got trained on watertight doors and fire doors. Everyone who took the stand agreed, Royal Caribbean did not train its crew members on semi-watertight doors.
> . . .
> [I]t is the only door of all three doors that Royal Caribbean does not train on.
> Now I ask you, is that reasonable? Because you'll get a jury instruction asking you to evaluate the conduct in this case for both parties to determine whether it was reasonable. And I would submit to you that that was unreasonable on behalf of Royal Caribbean.

37

In addition to the evidence of the alleged design defect and negligent training, Spearman also presented evidence that Royal Caribbean failed to place a warning sign on the Semi-Watertight door regarding the pinch point hazard. The door's user manual, which was submitted into evidence and read to the jury both during Spearman's presentation and closing argument, stated, "[a]t the beginning, the speed of the opening movement is very fast. Watch your fingers, you may lose them." On this point, the trial court took judicial notice and instructed the jury that twelve prior incidents involving such safety doors occurred under "substantially similar circumstances, conditions, and causes to the accident in dispute." Finally, Spearman testified that immediately after her injury, "[Security Officer Cooke] said to me that 'These types of injuries have happened before on doors onboard.'" Despite notice of potential injury, the operation sticker placed on the door bore no warning of the potential pinch point, instead it instructed a person wishing to open the closed door to press the lever and "slide the door open."

During closing argument, Spearman argued that Royal Caribbean was negligent in failing to place a warning sign on the door. Counsel for Spearman argued to the jury that "Royal Caribbean knew that [workers had been injured by the door's pinch point], but the people who are actually

38

operating the doors did not know that." Showing a picture of the door, Spearman argued,

> Look how much space there is to have warnings right here. There are no warnings on this door that in any way let people know that this door is a pinch[]point, draw-in hazard. If this handle goes over here to the pocket, if you're trying to open this door and it takes your hand, you could lose your fingers.
> The warning manual lets people know that there's enough of a hazard if your fingers get pulled in. But there's nothing on this door that actually would warn someone of that.

Finally, Spearman also presented evidence that the nurse—a Royal Caribbean agent—violated the ship's safety protocol by attempting to pass through the door during the safety drill. During closing argument, counsel for Spearman focused heavily on her agency negligence claim asserting, "[Spearman] was following her training when she was put in a position by a fellow crew member, employee, agent of Royal Caribbean, [the nurse]," who was "breaking the rules." The nurse "violated her training by going through a door that she knew or had reason to know was under bridge control." In closing, Spearman made a point of tying these theories of liability to both the Jones Act negligence claim and the unseaworthiness claim.

Without objection, the jury was presented with a general verdict form which neither listed nor asked the jury to make a specific finding as to each

theory of liability.[17] The jury returned the verdict for Spearman under both the Jones Act negligence and unseaworthiness claims. The jury awarded Spearman $20.3 million which the trial court reduced to $19,466,467. The trial court denied Royal Caribbean's motion for a new trial. This appeal followed.

## II.   Discussion

### a.  The two-issue rule.

The two-issue rule provides that "where there is no proper objection to the use of a general verdict, reversal is improper where no error is found as to one of two issues submitted to the jury on the basis that the appellant is unable to establish that he has been prejudiced." Whitman v. Castlewood Int'l Corp., 383 So. 2d 618, 619 (Fla. 1980) (citing Colonial Stores, Inc. v. Scarbrough, 355 So. 2d 1181, 1186 (Fla. 1977)). When at least one issue is left unchallenged and the defendant does not request a special interrogatory verdict, an appellate court is "compelled conclusively to presume that the

---

[17] The verdict form asked four questions on liability: (1) whether there was negligence on the part of Royal Caribbean that was a legal cause of damage to Spearman; (2) whether the vessel was unseaworthy in a manner that was a legal cause of damage to Spearman; (3) whether Spearman was negligent; and (4) what was the comparative percentage of negligence of the parties. The jury answered "yes" on first two questions, "no" on the third, and did not apportion any percentage under comparative fault to Spearman. The remaining questions concerned the itemization of damages.

40

verdict was grounded, at least in part," on the unchallenged theory under which no error occurred. <u>Variety Child.'s Hosp., Inc. v. Perkins</u>, 382 So. 2d 331, 334 (Fla. 3d DCA 1980).

"The rule is based on the principle that reversal is improper where no error is found as to one of the issues that can independently support the jury's verdict." <u>Barth v. Khubani</u>, 748 So. 2d 260, 261 (Fla. 1999). "[T]he rule is an economical tool that limits appellate review to issues that actually affect the case." <u>Id.</u> "The policy behind the 'two issue' rule is similar to that underlying the harmless error rule." <u>Food Lion, L.L.C. v. Henderson</u>, 895 So. 2d 1207, 1209 (Fla. 5th DCA 2005).

The two-issue rule is applied by analyzing whether the jury could have ruled on a theory of liability that is not the subject of an appellate challenge. <u>See</u> <u>Chua v. Hilbert</u>, 846 So. 2d 1179, 1182 (Fla. 4th DCA 2003). Essentially, if the jury is given several theories of liability—any one of which would result in a complete determination of fault—and finds liability generally, the two-issue rule prevents appellate review when the alleged trial court error only affects one of the theories without negating the others. The rule only applies when the different theories of liability seek the same damages.[18] It does not

---

[18] The rule does not apply, for example, when a plaintiff's first claim was that a developer misrepresented that property was oceanfront and the plaintiff's second claim was that the developer failed to complete a nature trail: the first

apply to a single cause of action's different components such as breach of duty and proximate cause.[19]

### b. Spearman's claims qualify as "different legal theories (or causes of action)" under the two-issue rule.

Royal Caribbean seeks to avoid the two-issue rule by characterizing the theories of liability in this case as the Jones Act claim and the unseaworthiness claim. Royal Caribbean accurately notes that "the testimony that the door was defectively designed . . . went to both the Jones Act negligence and unseaworthiness claims." It then argues that "the alternative incidents of negligence that [Spearman] presented to the jury (lack of training, . . . lack of a warning sticker, nurse's failure to follow procedure, etc.) . . . were not alternative causes of action." Instead, it maintains, Royal Caribbean would have a duty to train or warn about the Semi-Watertight door's "pinch point" or "draw in" hazard only if the door was defectively designed. Therefore, it argues, "[b]ecause both the Jones Act

---

claim entailed greater damages than the second claim. First Interstate Dev. Corp. v. Ablanedo, 511 So. 2d 536, 538 (Fla. 1987) ("This rule applies to those actions that can be brought on two theories of liability, but where a single basis for damages applies. For instance, in products liability, the claim can be brought on both negligence and breach of implied warranty, but the measure of damages for the resulting personal injury is the same.").

[19] See Grenitz v. Tomlian, 858 So. 2d 999, 1006 (Fla. 2003) ("[T]he two-issue rule does not apply where, as here, the two 'defenses' involved comprised separate elements of proof (breach of duty and proximate cause) necessary for the plaintiffs to prevail on a single cause of action (negligence).").

negligence and the unseaworthiness claims—the only two claims submitted to the jury in the general verdict form—were affected by the improper admission of expert testimony . . . , the two-issue rule does not apply."

The majority properly rejects this argument. In the first place, the safety protocols that the nurse violated were in effect at the time of the accident and did not depend on a finding that the door was defectively designed. The nurse had a duty to obey the safety rules whether or not the door had a design defect. Royal Caribbean simply elides over this important feature of the trial. Similarly, even if the "pinch point" or "draw in" hazard of the door was not indicative of a defective design (which Royal Caribbean argued to the jury), Royal Caribbean would still have a duty to train staff and post warnings so the known hazard could be avoided.

More importantly, Royal Caribbean contends that Spearman's claims traveled under the umbrella of unseaworthiness and Jones Act negligence and therefore cannot be further classified into four separate theories of liability for purposes of the two-issue rule. This argument cannot be reconciled with the cases. Application of the two-issue rule does not turn on whether different causes of action are pled within the same count or counts of the complaint. Application of the two-issue rule looks instead to the substance of the theories of liability. Royal Caribbean's argument to the

43

contrary is not supported by the Supreme Court's decision in <u>Barth</u> and conflicts with the decisions of other district courts.

<u>Barth</u> never held that the focus of the two-issue rule was on "causes of action" in contradistinction to "theories of liability." Instead, even in the one sentence from <u>Barth</u> relied upon so heavily by Royal Caribbean, the Supreme Court held the focus was on "theories of liability (or causes of action)":

> When a general verdict for the plaintiff is on review, the rule is applied by focusing on the causes of action, such that an appellate claim of error raised by the defendant as to one cause of action cannot be the basis for reversal where two or more <u>theories of liability (or causes of action)</u> were presented to the jury.

748 So. 2d at 261 (emphasis added). In treating the terms as interchangeable for purposes of the two-issue rule, the Court was merely following generally accepted legal usage. A "cause of action" refers to "a legal theory of a lawsuit." Bryan A. Garner, <u>A Dictionary of Modern Legal Usage</u> 140 (2d ed. 1995); <u>see also</u> <u>Cause of Action</u>, <u>Black's Law Dictionary</u> (11th ed. 2019) (same). Contrary to Royal Caribbean's argument, therefore, the Court in <u>Barth</u> was referring to the allegations that give rise to substantively separate legal obligations or defenses, not merely the headings of various counts in a complaint.

Similarly, in <u>Chua</u>, the Fourth District applied the two-issue rule to uphold a general verdict for the plaintiff in a medical malpractice case. 846 So. 2d at 1182. In the appeal, the defendant challenged the admission of testimony relating to alleged negligent performance of the surgery at issue. The court held that the verdict could be supported by the alternative theory, also presented to the jury, of lack of informed consent. <u>Id.</u> The court applied the two-issue rule even though it acknowledged "the informed consent claim was pleaded under the same heading as the negligent performance issues" because "lack of informed consent is really a separate theory of liability and is different from an alternative theory of negligent performance of a surgical procedure." <u>Id.</u>; <u>see also</u> <u>Marriott Int'l. Inc. v. Perez-Melendez</u>, 855 So. 2d 624, 626 (Fla. 5th DCA 2003) (applying two-issue rule after observing that "[e]ncased within the same count of the complaint are four separate theories of liability"). Royal Caribbean's argument that the two-issue rule focuses only on "causes of action" in contradistinction to "theories of liability" is in direct conflict with the language of <u>Barth</u> and with the Fourth District's holding in <u>Chua</u> and the Fifth District's holding in <u>Perez-Melendez</u>.

Turning then to the substance of Spearman's claims, she presented four different theories of negligence under the umbrella of her Jones Act and unseaworthiness claims: defective design, negligent training, failure to warn,

45

and co-worker's negligence. These claims present separate and distinct "theories of liability (or causes of action)" of the sort that have been held to come within the two-issue rule. See, e.g., Whitman, 383 So. 2d at 619 (applying two-issue rule to general verdict for plaintiff where the different theories of liability were failure to provide safe premises for invitee and negligence of agent in committing act); Henderson, 895 So. 2d at 1208 (applying two-issue rule to general verdict for plaintiff where the different theories of liability were failure to maintain property and failure to warn); Perez-Melendez, 855 So. 2d at 627 (applying two-issue rule to general verdict for plaintiff where the different theories of liability were failure to maintain property, failure to correct dangerous condition, and failure to warn).[20] I do not see how Spearman's claims can meaningfully be distinguished from these similar claims which were found to be subject to the two-issue rule.

---

[20] See also Barth, 748 So. 2d at 261 (applying two-issue rule to general verdict for defendant in breach of contract action where the different theories of defense were no contract, failure of condition precedent, and statute of frauds); Colonial Stores, 355 So. 2d at 1185 (applying two-issue rule to general verdict for plaintiff where the different theories of liability were malicious prosecution and false imprisonment); Johnson v. Thigpen, 788 So. 2d 410, 412 (Fla. 1st DCA 2001) (applying two-issue rule to general verdict for plaintiff when the different theories of liability were assault, battery, false imprisonment, and intentional infliction of emotional distress).

In sum, because the jury was presented with separate "theories of liability (or causes of action)," Barth, 748 So. 2d at 261, and returned only a general verdict, "it is impossible to determine on which theory the jury predicated liability . . . . Therefore, it is appropriate to apply the two-issue rule in this instance." Perez-Melendez, 855 So. 2d at 627.

### c. The Challenged Expert Testimony Did Not Prejudice the Jury Regarding Spearman's Other Theories of Liability.

Finally, Royal Caribbean seeks to avoid the application of the two-issue rule by contending that the improper admission of the expert's testimony regarding the ability to redesign the door "was so highly prejudicial . . . that it affected the entire trial, rendering the two-issue rule inapplicable." For this contention, Royal Caribbean relies on Browning v. Lewis, 582 So. 2d 101 (Fla. 2d DCA 1991).

In Browning, a mother sued an obstetrician for negligence resulting in injuries to her infant during birth. The obstetrician introduced testimony that the mother engaged in illegal drug use:

> That testimony involved a particular occasion of both drug and alcohol use before the mother knew she was pregnant and indicated that the mother had drunk a lot, at least on that occasion, before she had become aware of her pregnancy and had reduced her intake to only beer and less beer than before.

Id. at 101. After determining that the evidence was improperly admitted, the appellate court declined to apply the two-issue rule because the evidence

47

was "highly prejudicial to [the] plaintiff's entire case." Id. at 102 (citing Kane Furniture Corp. v. Miranda, 506 So. 2d 1061, 1067 (Fla. 2d DCA 1987)).

Reading Browning in context with Kane Furniture, it is evident that testimony only becomes prejudicial enough to prevent application of the two-issue rule when the evidence is so inflammatory as to tend to influence the jury to make its decision based on emotion rather than logic. In Kane Furniture, a husband sued the employer of a vehicle driver for negligence after a fatal car accident resulting in the death of his wife. The husband presented "repetitive, highly emotional" testimony about the loss of his wife:

> Miranda presented four different witnesses who testified as to the good-natured disposition of the decedent and the loving family relationship of the Mirandas. Miranda presented detailed testimony concerning the family's reaction to decedent's death. He presented a slide show which, among other things, depicted: the Miranda's wedding; a daughter's graduation; Christmas; family birthday celebrations; visits to Disney World and SeaEscape; and decedent's casket.

Kane Furniture, 506 So. 2d at 1067. The appellate court determined that the cumulative effect of this highly emotional evidence "deprived Kane of a fair trial . . . [because] '[m]ere sympathy cannot sustain a judgment . . . the jury system should not function on emotion, but on logic.'" Id. (quoting Fla. Patient's Comp. Fund v. Von Stetina, 474 So. 2d 783, 790 (Fla. 1985)).

The evidence presented by Spearman was not emotional, but rather highly technical. The challenged expert testimony was intended to show the

48

jury that Royal Caribbean had the option to install a safer door. Unlike the evidence of an expectant mother taking drugs and drinking during pregnancy as presented in <u>Browning</u>, or the emotional devastation of a mourning family as shown in <u>Kane Furniture</u>, this evidence would not normally tend to inflame the passions of the jury. <u>See</u> <u>Fla. Motor Lines, Inc. v. Bradley</u>, 164 So. 360, 364 (Fla. 1935) (Brown, J., dissenting in part) ("If the exhibition does not tend to instruct the jury, but only to excite their sympathies or inflame their passions, it should not be permitted."). The instructional nature of the evidence is reflected in a question submitted by the jury in response to the evidence. Far from showing a passionate response, the jury asked the most logical question a person presented with such evidence would likely ask: "How much would it have cost for Royal Caribbean to modify the door and why wasn't it done?"

The two-issue rule, therefore, applies and precludes appellate consideration of Royal Caribbean's challenge to the expert's testimony regarding an alternative design to the Semi-Watertight door.